## BROWN ET AL. *v.* SOCIALIST WORKERS '74 CAMPAIGN COMMITTEE (OHIO) ET AL.

No. 81–776.   Argued October 4, 1982—Decided December 8, 1982

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, and POWELL, JJ., joined, and in Parts I, III, and IV of which BLACKMUN, J., joined.   BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 102.   O'CON-NOR, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST and STEVENS, JJ., joined, *post*, p. 107.

*Gary Elson Brown,* Assistant Attorney General of Ohio, argued the cause for appellants.   With him on the briefs

were *William J. Brown*, Attorney General, *Thomas F. Staub*, Assistant Attorney General, and *James R. Rishel*.

*Thomas D. Buckley, Jr.*, argued the cause for appellees. With him on the brief were *Gordon J. Beggs, Ben Sheerer*, and *Bruce Campbell*.

JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the question whether certain disclosure requirements of the Ohio Campaign Expense Reporting Law, Ohio Rev. Code Ann. § 3517.01 *et seq.* (1972 and Supp. 1981), can be constitutionally applied to the Socialist Workers Party, a minor political party which historically has been the object of harassment by government officials and private parties. The Ohio statute requires every political party to report the names and addresses of campaign contributors and recipients of campaign disbursements. In *Buckley* v. *Valeo*, 424 U. S. 1 (1976), this Court held that the First Amendment prohibits the government from compelling disclosures by a minor political party that can show a "reasonable probability" that the compelled disclosures will subject those identified to "threats, harassment, or reprisals." *Id.*, at 74. Employing this test, a three-judge District Court for the Southern District of Ohio held that the Ohio statute is unconstitutional as applied to the Socialist Workers Party. We affirm.

I

The Socialist Workers Party (SWP) is a small political party with approximately 60 members in the State of Ohio. The Party states in its constitution that its aim is "the abolition of capitalism and the establishment of a workers' government to achieve socialism." As the District Court found, the SWP does not advocate the use of violence. It seeks instead to achieve social change through the political process, and its members regularly run for public office. The SWP's candidates have had little success at the polls. In 1980, for example, the Ohio SWP's candidate for the United States Senate received fewer than 77,000 votes, less than 1.9% of the total

vote.   Campaign contributions and expenditures in Ohio have averaged about $15,000 annually since 1974.

In 1974 appellees instituted a class action[1] in the District Court for the Northern District of Ohio challenging the constitutionality of the disclosure provisions of the Ohio Campaign Expense Reporting Law.   The Ohio statute requires every candidate for political office to file a statement identifying each contributor and each recipient of a disbursement of campaign funds.   § 3517.10.[2]   The "object or pur-

---

[1] The plaintiff class as eventually certified includes all SWP candidates for political office in Ohio, their campaign committees and treasurers, and people who contribute to or receive disbursements from SWP campaign committees.   The defendants are the Ohio Secretary of State and other state and local officials who administer the disclosure law.

[2] Section 3517.10 provides in relevant part:

"(A) Every campaign committee, political committee, and political party which made or received a contribution or made an expenditure in connection with the nomination or election of any candidate at any election held in this state shall file, on a form prescribed under this section, a full, true, and itemized statement, made under penalty of election falsification, setting forth in detail the contributions and expenditures . . . .

.          .          .          .          .

"(B) Each statement required by division (A) of this section shall contain the following information:

.          .          .          .          .

"(4) A statement of contributions made or received, which shall include:

"(a) The month, day, and year of the contribution;

"(b) The full name and address of each person, including any chairman or treasurer thereof if other than an individual, from whom contributions are received.   The requirement of filing the full address does not apply to any statement filed by a state or local committee of a political party, to a finance committee of such committee, or to a committee recognized by a state or local committee as its fund-raising auxiliary.

"(c) A description of the contribution received, if other than money;

"(d) The value in dollars and cents of the contribution;

"(e) All contributions and expenditures shall be itemized separately regardless of the amount except a receipt of a contribution from a person in the sum of twenty-five dollars or less at one social or fund-raising activity. An account of the total contributions from each such social or fund-raising activity shall be listed separately, together with the expenses incurred and

pose"[3] of each disbursement must also be disclosed. The lists of names and addresses of contributors and recipients are open to public inspection for at least six years. Violations of the disclosure requirements are punishable by fines of up to $1,000 for each day of violation. § 3517.99.

On November 6, 1974, the District Court for the Northern District of Ohio entered a temporary restraining order barring the enforcement of the disclosure requirements against the class pending a determination of the merits.[4] The case was then transferred to the District Court for the Southern District of Ohio, which entered an identical temporary restraining order in February 1975.[5] Accordingly, since 1974

---

paid in connection with such activity. No continuing association which makes a contribution from funds which are derived solely from regular dues paid by members of the association shall be required to list the name or address of any members who paid such dues.

"(5) A statement of expenditures which shall include:

"(a) The month, day, and year of expenditure;

"(b) The full name and address of each person to whom the expenditure was made, including any chairman or treasurer thereof if a committee, association, or group of persons;

"(c) The object or purpose for which the expenditure was made;

"(d) The amount of each expenditure.

"(C) . . .

.          .          .          .          .

". . . All such statements shall be open to public inspection in the office where they are filed, and shall be carefully preserved for a period of at least six years."

If the candidate is running for a statewide office, the statement shall be filed with the Ohio Secretary of State; otherwise, the statement shall be filed with the appropriate county board of elections. § 3517.11(A).

[3] § 3517.10(B)(5)(c).

[4] The order restrained various state officials from "applying to or enforcing against plaintiffs . . . the disclosure provisions of the Ohio Campaign Expense Reporting Law and the penalty provision of that law, the effect of which will be to postpone the beginning of any possible period of violation of that law by plaintiffs, . . . until such time as the case is decided by the three judge panel, which is hereby convened." (Citations omitted.)

[5] Apparently none of the parties throughout the 6-year period questioned whether the extended duration of the temporary restraining order

appellees have not disclosed the names of contributors and recipients but have otherwise complied with the statute. A three-judge District Court was convened pursuant to 28 U. S. C. § 2281. Following extensive discovery, the trial was held in February 1981. After reviewing the "substantial evidence of both governmental and private hostility toward and harassment of SWP members and supporters," the three-judge court concluded that under *Buckley* v. *Valeo*, 424 U. S. 1 (1976), the Ohio disclosure requirements are unconstitutional as applied to appellees.[6] We noted probable jurisdiction. 454 U. S. 1122 (1981).

## II

The Constitution protects against the compelled disclosure of political associations and beliefs. Such disclosures "can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley* v. *Valeo, supra,* at 64, citing *Gibson* v. *Florida Legislative Comm.*, 372 U. S. 539 (1963); *NAACP* v. *Button*, 371 U. S. 415 (1963); *Shelton* v. *Tucker*, 364 U. S. 479 (1960); *Bates* v. *Little Rock*, 361 U. S. 516 (1960); *NAACP* v. *Alabama*, 357 U. S. 449 (1958). "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP* v. *Alabama, supra,* at 462. The right to privacy in one's political associations and beliefs will yield

---

conformed to the requirements of Rule 65(b) of the Federal Rules of Civil Procedure.

[6] Because it invalidated the Ohio statute as applied to the Ohio SWP, the District Court did not decide appellees' claim that the statute was facially invalid. The Ohio statute requires disclosure of contributions and expenditures no matter how small the amount. Ohio Rev. Code Ann. § 3517.10(B)(4)(e) (Supp. 1981). Appellees contended that the absence of a monetary threshold rendered the statute facially invalid since the compelled disclosure of nominal contributions and expenditures lacks a substantial nexus with any claimed government interest. See *Buckley* v. *Valeo*, 424 U. S., at 82–84.

The District Court's opinion is unreported.

only to a "'subordinating interest of the State [that is] compelling,'" *NAACP* v. *Alabama, supra,* at 463 (quoting *Sweezy* v. *New Hampshire,* 354 U. S. 234, 265 (1957) (opinion concurring in result)), and then only if there is a "substantial relation between the information sought and [an] overriding and compelling state interest." *Gibson* v. *Florida Legislative Comm., supra,* at 546.

In *Buckley* v. *Valeo* this Court upheld against a First Amendment challenge the reporting and disclosure requirements imposed on political parties by the Federal Election Campaign Act of 1971. 2 U. S. C. § 431 *et seq.* 424 U. S., at 60–74. The Court found three government interests sufficient in general to justify requiring disclosure of information concerning campaign contributions and expenditures:[7] enhancement of voters' knowledge about a candidate's possible allegiances and interests, deterrence of corruption, and the enforcement of contribution limitations.[8] The Court stressed, however, that in certain circumstances the balance of interests requires exempting minor political parties from compelled disclosures. The government's interests in compelling disclosures are "diminished" in the case of minor parties. *Id.,* at 70. Minor party candidates "usually represent definite and publicized viewpoints" well known to the public, and the improbability of their winning reduces the dangers of corruption and vote-buying. *Ibid.* At the same time, the potential for impairing First Amendment interests is substantially greater:

---

[7] Title 2 U. S. C. §§ 432, 434, and 438 (1976 ed., Supp. V) require each political committee to keep detailed records of both contributions and expenditures, including the names of campaign contributors and recipients of campaign disbursements, and to file reports with the Federal Election Commission which are made available to the public.

[8] The government interest in enforcing limitations is completely inapplicable in this case, since the Ohio law imposes no limitations on the amount of campaign contributions.

> "We are not unmindful that the damage done by disclosure to the associational interests of the minor parties and their members and to supporters of independents could be significant. These movements are less likely to have a sound financial base and thus are more vulnerable to falloffs in contributions. In some instances fears of reprisal may deter contributions to the point where the movement cannot survive. The public interest also suffers if that result comes to pass, for there is a consequent reduction in the free circulation of ideas both within and without the political arena." *Id.*, at 71 (footnotes omitted).

We concluded that in some circumstances the diminished government interests furthered by compelling disclosures by minor parties does not justify the greater threat to First Amendment values.

*Buckley* v. *Valeo* set forth the following test for determining when the First Amendment requires exempting minor parties from compelled disclosures:

> "The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.*, at 74.

The Court acknowledged that "unduly strict requirements of proof could impose a heavy burden" on minor parties. *Ibid.* Accordingly, the Court emphasized that "[m]inor parties must be allowed sufficient flexibility in the proof of injury." *Ibid.*

> "The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient. New parties that have no history upon which to draw may be

able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views." *Ibid.*

Appellants concede that the *Buckley* test for exempting minor parties governs the disclosure of the names of *contributors*, but they contend that the test has no application to the compelled disclosure of names of *recipients* of campaign disbursements.[9] Appellants assert that the State has a substantial interest in preventing the misuse of campaign funds.[10] They also argue that the disclosure of the names of

---

[9] We believe that the question whether the *Buckley* test applies to the compelled disclosure of recipients of expenditures is properly before us. Throughout this litigation Ohio has maintained that it can constitutionally require the SWP to disclose the names of both campaign contributors and recipients of campaign expenditures. In invalidating both aspects of the Ohio statute as applied to the SWP, the District Court necessarily held (1) that the *Buckley* standard, which permits flexible proof of the reasonable probability of threats, harassment, or reprisals, applies to both contributions and expenditures, and (2) that the evidence was sufficient to show a reasonable probability that disclosure would subject both contributors and recipients to public hostility and harassment. In their jurisdictional statement, appellants appealed from the entire judgment entered below and presented the following question for review:

"Whether, under the standards set forth by this Court in *Buckley* v. *Valeo*, 424 U. S. 1 (1976), the provisions of Sections 3517.10 and 3517.11 of the Ohio Revised Code, which require that the campaign committee of a candidate for public office file a report disclosing the full names and addresses of persons making contributions to or receiving expenditures from such committee, are consistent with the right of privacy of association guaranteed by the First and Fourteenth Amendments of the Constitution of the United States when applied to the committees of candidates of a minority party which can establish only isolated instances of harassment directed toward the organization or its members within Ohio during recent years." Juris. Statement i.

We think that the correctness of both holdings of the District Court is "fairly included" in the question presented in the jurisdictional statement. This Court's Rule 15.1(a). See *Procunier* v. *Navarette*, 434 U. S. 555, 559, n. 6 (1978) ("[O]ur power to decide is not limited by the precise terms of the question presented").

[10] This is one of three government interests identified in *Buckley*. Appellants do not contend that the other two interests, enhancing voters' abil-

recipients of campaign funds will have no significant impact on First Amendment rights, because, unlike a contribution, the mere receipt of money for commercial services does not affirmatively express political support.

We reject appellants' unduly narrow view of the minor-party exemption recognized in *Buckley*. Appellants' attempt to limit the exemption to laws requiring disclosure of contributors is inconsistent with the rationale for the exemption stated in *Buckley*. The Court concluded that the government interests supporting disclosure are weaker in the case of minor parties, while the threat to First Amendment values is greater. Both of these considerations apply not only to the disclosure of campaign contributors but also to the disclosure of recipients of campaign disbursements.

Although appellants contend that requiring disclosure of recipients of disbursements is necessary to prevent corruption, this Court recognized in *Buckley* that this concededly legitimate government interest has less force in the context of minor parties. The federal law considered in *Buckley*, like the Ohio law at issue here, required campaign committees to identify both campaign contributors and recipients of campaign disbursements. 2 U. S. C. §§ 432(c) and (d), and 434(a) and (b). We stated that "by exposing large contributions *and expenditures* to the light of publicity," disclosure requirements "ten[d] to 'prevent the corrupt use of money to affect elections.'" *Id.*, at 67 (emphasis added), quoting *Burroughs* v. *United States*, 290 U. S. 534, 548 (1934). We concluded, however, that because minor party candidates are unlikely to win elections, the government's general interest in "deterring the 'buying' of elections" is "reduced" in the case of minor parties. 424 U. S., at 70.[11]

---

ity to evaluate candidates and enforcing contribution limitations, support the disclosure of the names of recipients of campaign disbursements.

[11] The partial dissent suggests that the government interest in the disclosure of recipients of expenditures is not significantly diminished in the case of minor political parties, since parties with little likelihood of electoral success might nevertheless finance improper campaign activities merely to

Moreover, appellants seriously understate the threat to First Amendment rights that would result from requiring minor parties to disclose the recipients of campaign disburse-

gain recognition.  *Post*, at 109–110.  The partial dissent relies on JUSTICE WHITE's separate opinion in *Buckley*, in which he pointed out that "unlimited money tempts people to spend it on *whatever* money can buy to influence an election."  424 U. S., at 265 (emphasis in original).

An examination of the context in which JUSTICE WHITE made this observation indicates precisely why the state interest here is insubstantial. JUSTICE WHITE was addressing the constitutionality of ceilings on campaign expenditures applicable to all candidates.  His point was that such ceilings "could play a substantial role in preventing unethical practices." *Ibid.*  In the case of minor parties, however, their limited financial resources serve as a built-in expenditure ceiling which minimizes the likelihood that they will expend substantial amounts of money to finance improper campaign activities.  See *id.*, at 71.  For example, far from having "unlimited money," the Ohio SWP has had an average of roughly $15,000 available each year to spend on its election efforts.  Most of the limited resources of minor parties will typically be needed to pay for the ordinary fixed costs of conducting campaigns, such as filing fees, travel expenses, and the expenses incurred in publishing and distributing campaign literature and maintaining offices.  Thus JUSTICE WHITE's observation that "financing illegal activities is low on the campaign organization's priority list," *id.*, at 265, is particularly apposite in the case of minor parties.  We cannot agree, therefore, that minor parties are as likely as major parties to make significant expenditures in funding dirty tricks or other improper campaign activities.  See *post*, at 110.  Moreover, the expenditure by minor parties of even a substantial portion of their limited funds on illegal activities would be unlikely to have a substantial impact.

Furthermore, the mere possibility that minor parties will resort to corrupt or unfair tactics cannot justify the substantial infringement on First Amendment interests that would result from compelling the disclosure of recipients of expenditures.  In *Buckley*, we acknowledged the possibility that supporters of a major party candidate might channel money into minor parties to divert votes from other major party contenders, 424 U. S., at 70, and that, as noted by the partial dissent, *post*, at 110, and n. 5, occasionally minor parties may affect the outcomes of elections.  We thus recognized that the distorting influence of large contributors on elections may not be entirely absent in the context of minor parties.  Nevertheless, because we concluded that the government interest in disclosing contributors is substantially reduced in the case of minor parties, we held that minor parties

ments.  Expenditures by a political party often consist of reimbursements, advances, or wages paid to party members, campaign workers, and supporters, whose activities lie at the very core of the First Amendment.[12]  Disbursements may also go to persons who choose to express their support for an unpopular cause by providing services rendered scarce by public hostility and suspicion.[13]  Should their involvement be publicized, these persons would be as vulnerable to threats, harassment, and reprisals as are contributors whose connection with the party is solely financial.[14]  Even individuals

are entitled to an exemption from requirements that contributors be disclosed where they can show a reasonable probability of harassment.  424 U. S., at 70.  Because we similarly conclude that the government interest in requiring the disclosure of recipients of expenditures is substantially reduced in the case of minor parties, we hold that the minor-party exemption recognized in *Buckley* applies to compelled disclosure of expenditures as well.

[12] For example, the expenditure statements filed by the SWP contain a substantial percentage of entries designated as per diem, travel expenses, room rental, and so on.  The Ohio statute makes it particularly easy to identify these individuals since it requires disclosure of the *purpose* of the disbursements as well as the identity of the recipients.  Ohio Rev. Code Ann. § 3517.10(B)(5)(c) (Supp. 1981).

[13] " '[F]inancial transactions can reveal much about a person's activities, associations, and beliefs.' "  *Buckley* v. *Valeo,* 424 U. S., at 66, quoting *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 78–79 (1974) (POWELL, J., concurring).  The District Court found that the Federal Bureau of Investigation (FBI) at least until 1976 routinely investigated the financial transactions of the SWP and kept track of the payees of SWP checks.

[14] The fact that some or even many recipients of campaign expenditures may not be exposed to the risk of public hostility does not detract from the serious threat to the exercise of First Amendment rights of those who are so exposed.  We cannot agree with the partial dissent's assertion that disclosures of disbursements paid to campaign workers and supporters will not increase the probability that they will be subjected to harassment and hostility.  *Post,* at 111–112.  Apart from the fact that individuals may work for a candidate in a variety of ways without publicizing their involvement, the application of a disclosure requirement results in a dramatic increase in public exposure.  Under Ohio law a person's affiliation with the party will be recorded in a document that must be kept open to inspection

who receive disbursements for "merely" commercial transactions may be deterred by the public enmity attending publicity, and those seeking to harass may disrupt commercial activities on the basis of expenditure information.[15]   Because an individual who enters into a transaction with a minor party purely for commercial reasons lacks any ideological commitment to the party, such an individual may well be deterred from providing services by even a small risk of harassment.[16]   Compelled disclosure of the names of such recipients of expenditures could therefore cripple a minor party's ability to operate effectively and thereby reduce "the free circulation of ideas both within and without the political arena." *Buckley,* 424 U. S., at 71 (footnotes omitted).   See *Sweezy* v. *New Hampshire,* 354 U. S., at 250–251 (plurality opinion) ("Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents").

We hold, therefore, that the test announced in *Buckley* for safeguarding the First Amendment interests of minor parties and their members and supporters applies not only to the compelled disclosure of campaign contributors but also to the compelled disclosure of recipients of campaign disbursements.

## III

The District Court properly applied the *Buckley* test to the facts of this case.   The District Court found "substantial evi-

---

by any one who wishes to examine it for a period of at least six years. Ohio Rev. Code Ann. § 3517.10(C) (Supp. 1981).   The preservation of unorthodox political affiliations in public records substantially increases the potential for harassment above and beyond the risk that an individual faces simply as a result of having worked for an unpopular party at one time.

[15] See, *e. g., Socialist Workers Party* v. *Attorney General,* 458 F. Supp. 895, 904 (SDNY 1978) (FBI interference with SWP travel arrangements and speaker hall rental), vacated on other grounds, 596 F. 2d 58 (CA2), cert. denied, 444 U. S. 903 (1979).

[16] Moreover, it would be hard to think of many instances in which the state interest in preventing vote-buying and improper campaign activities

dence of both governmental and private hostility toward and harassment of SWP members and supporters." Appellees introduced proof of specific incidents of private and government hostility toward the SWP and its members within the four years preceding the trial. These incidents, many of which occurred in Ohio and neighboring States, included threatening phone calls and hate mail, the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office. There was also evidence that in the 12-month period before trial 22 SWP members, including 4 in Ohio, were fired because of their party membership. Although appellants contend that two of the Ohio firings were not politically motivated, the evidence amply supports the District Court's conclusion that "private hostility and harassment toward SWP members make it difficult for them to maintain employment."

The District Court also found a past history of Government harassment of the SWP. FBI surveillance of the SWP was "massive" and continued until at least 1976. The FBI also conducted a counterintelligence program against the SWP and the Young Socialist Alliance (YSA), the SWP's youth organization. One of the aims of the "SWP Disruption Program" was the dissemination of information designed to impair the ability of the SWP and YSA to function. This program included "disclosing to the press the criminal records of SWP candidates, and sending anonymous letters to SWP members, supporters, spouses, and employers." [17] Until at least 1976, the FBI employed various covert techniques to

---

would be furthered by the disclosure of payments for routine commercial services.

[17] The District Court was quoting from Part I of the Final Report of Special Master Judge Breitel in *Socialist Workers Party* v. *Attorney General of the United States*, 73 Civ. 3160 (TPG) (SDNY, Feb. 4, 1980), detailing the United States Government's admissions concerning the existence and nature of the Government surveillance of the SWP.

obtain information about the SWP, including information concerning the sources of its funds and the nature of its expenditures. The District Court specifically found that the FBI had conducted surveillance of the Ohio SWP and had interfered with its activities within the State.[18] Government surveillance was not limited to the FBI. The United States Civil Service Commission also gathered information on the SWP, the YSA, and their supporters, and the FBI routinely distributed its reports to Army, Navy and Air Force Intelligence, the United States Secret Service, and the Immigration and Naturalization Service.

The District Court properly concluded that the evidence of private and Government hostility toward the SWP and its members establishes a reasonable probability that disclosing the names of contributors and recipients will subject them to threats, harassment, and reprisals.[19] There were numerous instances of recent harassment of the SWP both in Ohio and

---

[18] The District Court also found the following:

"The Government possesses about 8,000,000 documents relating to the SWP, YSA . . . and their members. . . . Since 1960 the FBI has had about 300 informants who were members of the SWP and/or YSA and 1,000 nonmember informants. Both the Cleveland and Cincinnati FBI field offices had one or more SWP or YSA member informants. Approximately 21 of the SWP member informants held local branch offices. Three informants even ran for elective office as SWP candidates. The 18 informants whose files were disclosed to Judge Breitel received total payments of $358,648.38 for their services and expenses." (Footnotes omitted.)

[19] After reviewing the evidence and the applicable law, the District Court concluded: "[T]he totality of the circumstances establishes that, in Ohio, public disclosure that a person is a member of or has made a contribution to the SWP would create a reasonable probability that he or she would be subjected to threats, harassment or reprisals." The District Court then enjoined the compelled disclosures of either contributors' or recipients' names. Although the District Court did not expressly refer in the quoted passage to disclosure of the names of recipients of campaign disbursements, it is evident from the opinion that the District Court was addressing both contributors and recipients.

in other States.[20]    There was also considerable evidence of
past Government harassment.    Appellants challenge the rel-
evance of this evidence of Government harassment in light of
recent efforts to curb official misconduct.    Notwithstanding
these efforts, the evidence suggests that hostility toward the
SWP is ingrained and likely to continue.    All this evidence
was properly relied on by the District Court.    *Buckley*, 424
U. S., at 74.

## IV

The First Amendment prohibits a State from compelling
disclosures by a minor party that will subject those persons
identified to the reasonable probability of threats, harass-
ment, or reprisals.    Such disclosures would infringe the

---

[20] Some of the recent episodes of threats, harassment, and reprisals
against the SWP and its members occurred outside of Ohio.    Anti-SWP
occurrences in places such as Chicago (SWP office vandalized) and Pitts-
burgh (shot fired at SWP building) are certainly relevant to the determina-
tion of the public's attitude toward the SWP in Ohio.    In *Buckley* we
stated that "[n]ew parties that have no history upon which to draw may
. . . offer evidence of reprisals and threats directed against individuals or
organizations holding similar views."    424 U. S., at 74.    Surely the Ohio
SWP may offer evidence of the experiences of other chapters espousing the
same political philosophy.    See *1980 Illinois Socialist Workers Campaign*
v. *State of Illinois Board of Elections*, 531 F. Supp. 915, 921 (ND Ill. 1981).

Appellants point to the lack of direct evidence linking the Ohio statute's
disclosure requirements to the harassment of campaign contributors or
recipients of disbursements.    In *Buckley*, however, we rejected such
"unduly strict requirements of proof" in favor of "flexibility in the proof of
injury."    424 U. S., at 74.    We thus rejected requiring a minor party to
"come forward with witnesses who are too fearful to contribute but not too
fearful to testify about their fear" or prove that "chill and harassment [are]
directly attributable to the specific disclosure from which the exemption is
sought."    *Ibid.*    We think that these considerations are equally applicable
to the proof required to establish a reasonable probability that recipients
will be subjected to threats and harassment if their names are disclosed.
While the partial dissent appears to agree, *post*, at 112–113, n. 7, its "sepa-
rately focused inquiry," *post*, at 112, and n. 7, in reality requires evidence
of chill and harassment directly attributable to the expenditure-disclosure
requirement.

First Amendment rights of the party and its members and supporters. In light of the substantial evidence of past and present hostility from private persons and Government officials against the SWP, Ohio's campaign disclosure requirements cannot be constitutionally applied to the Ohio SWP.

The judgment of the three-judge District Court for the Southern District of Ohio is affirmed.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I join Parts I, III, and IV of the Court's opinion and agree with much of what is said in Part II. But I cannot agree, with the Court or with the partial dissent, that we should reach the issue whether a standard of proof different from that applied to disclosure of campaign contributions should be applied to disclosure of campaign disbursements. See *ante,* at 94, n. 9; *post,* at 112–113, n. 7.[1] Appellants did not suggest in the District Court that different standards might apply. Nor was the issue raised in appellants' jurisdictional statement or in their brief on the merits in this Court. Consequently, I would merely *assume* for purposes of our present decision—as appellants apparently have assumed throughout this litigation and as the District Court clearly assumed—that the flexible proof rule of *Buckley* v. *Valeo,* 424 U. S. 1 (1976), applies equally to forced disclosure of contributions and to forced disclosure of expenditures. I would leave for another day, when the issue is squarely presented, considered by the courts below, and adequately briefed here, the significant question that now divides the Court.

This Court's Rule 15.1(a) states: "Only the questions set forth in the jurisdictional statement or fairly included therein

---

[1] Although the partial dissent agrees that this issue is not properly presented and therefore that the question should not be decided, *post,* at 112, n. 7, its result and reasoning endorse a different standard of proof. See n. 2, *infra.*

will be considered by the Court." Appellants' jurisdictional statement presented a single question:

> "Whether, under the standards set forth by this Court in *Buckley* v. *Valeo*, 424 U. S. 1 (1976), the provisions of Sections 3517.10 and 3517.11 of the Ohio Revised Code, which require that the campaign committee of a candidate for public office file a report disclosing the full names and addresses of persons making contributions to or receiving expenditures from such committee, are consistent with the right of privacy of association guaranteed by the First and Fourteenth Amendments of the Constitution of the United States when applied to the committees of candidates of a minority party which can establish only isolated instances of harassment directed toward the organization or its members within Ohio during recent years." Juris. Statement i.

The question *assumes* the applicability of *Buckley* to the entire case, and asks this Court to decide only whether the evidence presented to and facts found by the District Court were sufficient to support that court's conclusion that the *Buckley* test was satisfied.

Absent extraordinary circumstances, this Court does not decide issues beyond those it has agreed to review. *Mayor* v. *Educational Equality League*, 415 U. S. 605, 623 (1974); *United States* v. *Bass*, 404 U. S. 336, 339, n. 4 (1971); *General Talking Pictures Co.* v. *Western Electric Co.*, 304 U. S. 175, 178–179 (1938). According to the Court, however, the issue whether the flexible standard of proof established in *Buckley* applies to recipients of expenditures is "'fairly included' in the question presented." *Ante*, at 94, n. 9. But appellants' failure to present the issue was not a mere oversight in phrasing that question. That appellants did not invoke this Court's jurisdiction to review specifically the proper standard for disclosure of campaign expenditures is also apparent from appellants' arguments in their jurisdictional statement and their brief on the merits. In their juris-

dictional statement, under the heading "The Question is Substantial," appellants stated:

"The standards governing the resolution of actions involving challenges to reporting requirements by minority parties were set forth by this Court in the case of *Buckley* v. *Valeo*, 424 U. S. 1 (1976). In *Buckley* the Court held that in order to receive relief from reporting requirements such as those at issue in this action a minority party must establish '. . . a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment or reprisals from either Government officials or private parties.' 424 U. S. at 74." Juris. Statement 10.

Appellants went on to state that the flexible standard of proof of injury established in *Buckley* applied to "disclosure requirements." Juris. Statement 12–13. Similar assertions are found in appellants' brief on the merits. See Brief for Appellants 12 ("Summary of Argument"); *id.*, at 18 ("While refusing to grant minority parties a blanket exemption from financial disclosure requirements, the Court in *Buckley* established a standard under which they may obtain relief . . .").

Thus, appellants' exclusive theme in the initial presentation of their case here was that the District Court erred in finding that the *Buckley* standard was satisfied. They did not suggest that the standard was inapplicable, or applied differently, to campaign expenditure requirements. It was not until their reply brief, submitted eight years after this suit was instituted and at a time when appellees had no opportunity to respond in writing, that appellants sought to inject this new issue into the case. See *Irvine* v. *California*, 347 U. S. 128, 129 (1954) (plurality opinion of Jackson, J.). In my view, it simply cannot be said that it was "fairly included" in the jurisdictional statement.

Moreover, "[w]here issues are neither raised before nor considered [by the court below], this Court will not ordinarily

consider them." *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 147, n. 2 (1970); *Lawn* v. *United States*, 355 U. S. 339, 362–363, n. 16 (1958). The District Court did not address the question whether some standard other than that developed in *Buckley* should apply to disclosure of campaign expenditures. The reason for this was that appellants conceded in the District Court, as they concede here, that the "flexibility in the proof of injury" applicable to disclosure of contributors governed the entire case. In their post-trial memorandum, for example, appellants did not even hint that a different standard should govern disclosure of the identities of recipients of expenditures. Instead, they quoted the *Buckley* test and granted that "evidence of past harassment may be presented by plaintiffs in cases such as the instant one." Defendants' Post-Trial Memorandum 4–5.

This case presents no extraordinary circumstances justifying deviation from this Court's Rule 15.1(a) and its long-established practice respecting issues not presented below. We have deviated from the Rule when jurisdictional issues have been omitted by the parties and lower courts, see, *e. g.*, *United States* v. *Storer Broadcasting Co.*, 351 U. S. 192, 197 (1956), or when the Court has noticed "plain error" not assigned, see *Carpenters* v. *United States*, 330 U. S. 395, 412 (1947). Obviously, the issue that divides the Court from the partial dissent is not jurisdictional. Nor, as the Court's opinion persuasively demonstrates, is application of the *Buckley* test to disclosure of campaign disbursements "plain error." Indeed, I consider it quite possible that, after full consideration, the Court would adopt the *Buckley* standard in this context for the reasons stated by the Court. I also consider it quite possible that, after full consideration, the Court might wish to revise the *Buckley* standard as applied to campaign disbursements—perhaps to take account of the different types of expenditures covered and their differing impacts on associational rights, or perhaps along the lines suggested in the partial dissent. But this significant con-

stitutional decision should not be made until the question is properly presented so that the record includes data and arguments adequate to inform the Court's judgment.

The Court's apparent reliance on *Procunier* v. *Navarette*, 434 U. S. 555, 560, n. 6 (1978), does not provide a rationale for deciding this issue at this time. The petitioner there had included in his petition for certiorari all the questions we eventually decided. Notwithstanding the fact that the *Court* limited its grant of the petition to a single question, the parties fully briefed the questions on which review had been denied. Deciding those questions, therefore, was neither unwise nor unfair. In this case, in contrast, appellants affirmatively excluded the point at issue in their jurisdictional statement and in their brief on the merits. By failing to raise it until their reply brief, appellants prevented appellees from responding to the argument in writing. There can be no question that, as the Court observes, "'our *power* to decide is not limited by the precise terms of the question presented.'" *Ante*, at 94, n. 9 (quoting *Procunier* v. *Navarette*, 434 U. S., at 560, n. 6) (emphasis supplied). But Rule 15.1(a) is designed, as a prudential matter, to prevent the possibility that such tactics will result in ill-considered decisions. It is cases like this one that show the wisdom of the Rule.

Thus, for purposes of this case, I would *assume*, as appellants' jurisdictional statement and brief on the merits assume, that the *Buckley* standard applies to campaign expenditures just as it applies to contributions.[2] Appellees

---

[2] The partial dissent says it agrees that "this is not the appropriate case to determine whether a different test or standard of proof should be employed in determining the constitutional validity of required disclosure of expenditures." *Post*, at 112, n. 7. If that is so, however, appellees' proof, which the partial dissent agrees established a reasonable probability of threats, harassment, or reprisals against contributors, likewise allowed the District Court to find a reasonable probability of threats, harassment, or reprisals against recipients of expenditures. The *Buckley* standard permits proof that a particular disclosure creates the requisite likelihood of harassment to be based on a showing of harassment directed at members of

presented "specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself," sufficient under the rule in *Buckley* to establish a "reasonable probability" that the Ohio law would trigger "threats, harassment, or reprisals" against contributors. 424 U. S., at 74. On this basis, I would affirm the judgment of the District Court in its entirety.

JUSTICE O'CONNOR, with whom JUSTICE REHNQUIST and JUSTICE STEVENS join, concurring in part and dissenting in part.

I concur in the judgment that the Socialist Workers Party (SWP) has sufficiently demonstrated a reasonable probability that disclosure of contributors will subject those persons to threats, harassment, or reprisals, and thus under *Buckley* v. *Valeo*, 424 U. S. 1 (1976), the State of Ohio cannot constitutionally compel the disclosure. Further, I agree that the broad concerns of *Buckley* apply to the required disclosure of recipients of campaign expenditures. But, as I view the record presented here, the SWP has failed to carry its burden of showing that there is a reasonable probability that disclosure of recipients of expenditures will subject the recipients themselves or the SWP to threats, harassment, or reprisals. Moreover, the strong public interest in fair and honest elections outweighs any damage done to the associational rights of the party and its members by application of the State's expenditure disclosure law.

---

the party or at the organization itself. 424 U. S., at 74. Thus, I do not understand how the partial dissent's "separately focused inquiry" can "plainly require a different result," *post*, at 113, n. 7, or how it possibly can lead to the conclusion that "appellees did not carry their burden of production and persuasion insofar as they challenge the expenditure disclosure provisions," *post*, at 115—unless, despite the partial dissent's uncertain disclaimer, *post*, at 113, n. 7, its "separate focus" alters *Buckley's* "reasonable probability" and "flexible proof" standards in the context of expenditures.

## I

*Buckley* upheld the validity of the Federal Election Campaign Act of 1971, which requires the disclosure of names of both contributors to a campaign and recipients of expenditures from the campaign. *Buckley* recognized three major governmental interests in disclosure requirements: deterrence of corruption; enhancement of voters' knowledge about a candidate's possible allegiances and interests; and provision of the data and means necessary to detect violations of any statutory limitations on contributions or expenditures. The precise challenge that the *Buckley* Court faced, however, was the overbreadth of the Act's requirements "insofar as they apply to *contributions* to minor parties and independent candidates." *Id.*, at 68–69 (emphasis added).[1] Since the appellants in *Buckley* did not challenge the application to minor parties of requirements of disclosure of expenditures, the Court had no occasion to consider directly the First Amendment interests of a minor political party in preventing disclosure of expenditures, much less to weigh them against the governmental interests in disclosure. The test adopted by *Buckley*, quoted by the majority, *ante*, at 93, reflects this limitation, for it contemplates only assessing possible harassment of *contributors*, without a word about considering the harassment of recipients of expenditures if their names are disclosed or any effects this harassment may have on the party.

This is not to say that *Buckley* provides no guidance for resolving this claim. I agree with the majority that appellants

---

[1] Of course, the plaintiffs in *Buckley* challenged many aspects of the federal Act, including expenditure limitations and the disclosure requirements for *independent* contributions and expenditures. The Court upheld all disclosure requirements, including disclosure of independent expenditures "for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U. S., at 80. The plaintiffs in *Buckley* did not challenge, however, the federal requirement that all political parties, including minor political parties, disclose the recipients of their expenditures.

have overstated their argument in declaring that *Buckley* has no application to the disclosure of recipients of expenditures. Certainly, *Buckley* enunciates the general governmental interest in regulating minor parties, who, although unlikely to win, can often affect the outcome of an election. 424 U. S., at 70. *Buckley* also emphasizes the sensitive associational rights of minor parties.

Nevertheless, there are important differences between disclosure of contributors and disclosure of recipients of campaign expenditures—differences that the *Buckley* Court had no occasion to address, but that compel me to conclude that the balance should not necessarily be calibrated identically. First, unlike the government's interest in disclosure of contributions, its interest in disclosure of expenditures does not decrease significantly for small parties. The Court in *Buckley* recognized that knowing the identity of contributors would not significantly increase the voters' ability to determine the political ideology of the minor-party candidate, for the stance of the minor-party candidate is usually well known. *Ibid.*[2] Nor would identifying a minor party's contributors further the interest in preventing the "buying" of a candidate, because of the improbability of the minor-party candidate's winning the election. *Ibid.* Thus, these two major government interests in disclosure of contributions are significantly reduced for minor parties.[3]

In sharp contrast, however, the governmental interest in disclosure of expenditures remains significant for minor parties. The purpose of requiring parties to disclose expenditures is to deter improper influencing of voters. Corruption

---

[2] Certainly, that is true in this instance. The general political stance of the SWP and its candidates is readily discernible from the most cursory glance at its constitution or literature.

[3] The majority is obviously correct in noting that the third governmental interest articulated in *Buckley*—using disclosures to police limitations on contributions and expenditures—has no application to either contributions or expenditures in Ohio, since the Ohio statute sets no limitations on them.

of the electoral process can take many forms: the actual buying of votes; the use of "slush funds;" dirty tricks; and bribes of poll watchers and other election officials. Certainly, a "persuasive" campaign worker on election day can corral voters for his minor-party candidate with even a modest "slush fund."[4] Even though such improper practices are unlikely to be so successful as to attract enough votes to elect the minor-party candidate, a minor party, whose short-term goal is merely recognition, may be as tempted to resort to impermissible methods as are major parties, and the resulting deflection of votes can determine the outcome of the election of other candidates.[5] The requirement of a *full* and *verifiable* report of expenditures is important in deterring such practices, for otherwise the party could hide the improper transactions through an accounting sleight of hand.[6]

On the other side of the balance, disclosure of recipients of expenditures will have a lesser impact on a minority party's First Amendment interests than will disclosure of contribu-

---

[4] As JUSTICE WHITE noted in partial dissent in *Buckley*, 424 U. S., at 264–265, citing *Burroughs* v. *United States*, 290 U. S. 534 (1934):

"[T]he corrupt use of money by candidates is as much to be feared as the corrosive influence of large contributions. There are many illegal ways of spending money to influence elections. One would be blind to history to deny that unlimited money tempts people to spend it on *whatever* money can buy to influence an election." (Emphasis in original.)

[5] Certainly the SWP could have this effect. For example, appellants noted at oral argument that the SWP candidate in the 1974 Ohio gubernatorial election received some 95,000 votes. The Republican candidate's margin of victory over the Democratic candidate was only some 13,500 votes. Tr. of Oral Arg. 18. The impact of minor parties on elections in the United States is well documented. See generally W. Hesseltine, Third-Party Movements in the United States (1962).

[6] I therefore disagree with the majority's suggestion, *ante*, at 98–99, n. 16, that the government interest in deterring corruption is not furthered by disclosure of all expenditures, including those for commercial services. Even if improprieties are unlikely to occur in expenditures for commercial services, full and verifiable disclosure is needed to ensure that other, improper expenditures are not hidden in commercial accounts.

tors. As the majority states, *ante,* at 91, the First Amendment interest here is "[t]he right to privacy in one's political associations and beliefs." We have never drawn sharp distinctions between members and contributors, *Buckley,* 424 U. S., at 66. As we recognized in *Buckley,* the privacy rights of contributors are especially sensitive, since many seek to express their political views privately through their pocketbook rather than publicly through other means. Disclosure of contributors directly implicates the contributors' associational rights.

The impact on privacy interests arising from disclosure of expenditures is of a quite different—and generally lesser—dimension. Many expenditures of the minority party will be for quite mundane purposes to persons not intimately connected with the organization. Payments for such things as office supplies, telephone service, bank charges, printing and photography costs would generally fall in this category. The likelihood that such business transactions would dry up if disclosed is remote at best. Unlike silent contributors, whom disclosure would reveal to the public as supporters of the party's ideological positions, persons providing business services to a minor party are not generally perceived by the public as supporting the party's ideology, and thus are unlikely to be harassed if their names are disclosed. Consequently, the party's associational interests are unlikely to be affected by disclosure of recipients of such expenditures.

Other recipients of expenditures may have closer ideological ties to the party. The majority suggests that campaign workers receiving per diem, travel, or room expenses may fit in this category. *Ante,* at 97, n. 12. It is certainly conceivable that such persons may be harassed or threatened for their conduct. Laws requiring disclosure of recipients of expenditures, however, are not likely to contribute to this harassment. Once an individual has openly shown his close ties to the organization by campaigning for it, disclosure of receipt of expenditures is unlikely to increase the degree of

harassment so significantly as to deter the individual from campaigning for the party. Further, in striking the balance, the governmental concerns are greatest precisely for the actions of campaign workers that might improperly influence voters. Thus, whatever marginal deterrence that may arise from disclosure of expenditures is outweighed by the heightened governmental interest.

In sum, the heightened governmental interest in disclosure of expenditures and the reduced marginal deterrent effect on associational interests demand a separately focused inquiry into whether there exists a reasonable probability that disclosure will subject recipients or the party itself to threats, harassment, or reprisals.[7]

---

[7] According to the majority, "the question whether the *Buckley* test applies to the compelled disclosure of recipients of expenditures is properly before us." *Ante,* at 94, n. 9. The majority declares that, in answering this question, "the District Court necessarily *held* (1) that the *Buckley* standard, which permits flexible proof of the reasonable probability of threats, harassment, or reprisals, applies to both contributions and expenditures, and (2) that the evidence was sufficient to show a reasonable probability that disclosure would subject both contributors and recipients to public hostility and harassment." *Ibid.* (emphasis added).

JUSTICE BLACKMUN, *ante,* at 102, however, more accurately characterizes the District Court's action as *assuming* that the *Buckley* standard applies to disclosure of expenditures and *holding* the evidence sufficient to meet this standard. The District Court's assumption is understandable, since appellants did not question it below. Thus, this is not the appropriate case to determine whether a different test or standard of proof should be employed in determining the constitutional validity of required disclosure of expenditures.

Even assuming the general applicability of the *Buckley* standard, though, the question presented here requires us to inquire whether the evidence of harassment establishes a "reasonable probability" that the Ohio law would trigger "threats, harassment, or reprisals" against *recipients* of expenditures that in turn may harm the party's associational interests. This inquiry is necessarily distinct from the inquiry whether the evidence establishes a reasonable probability that disclosure would trigger threats, harassment, or reprisals against *contributors.* Although the proof requirements guiding this separate inquiry remain flexible, and direct proof

## II

Turning to the evidence in this case, it is important to remember that, even though proof requirements must be flexible, *Buckley, supra,* at 74, the minor party carries the burden of production and persuasion to show that its First Amendment interests outweigh the governmental interests. Additionally, the application of the *Buckley* standard to the historical evidence is most properly characterized as a mixed question of law and fact, for which we normally assess the record independently to determine if it supports the conclusion of unconstitutionality as applied.[8]

Here, there is no direct evidence of harassment of either contributors or recipients of expenditures. Rather, as the majority accurately represents it, the evidence concerns harassment and reprisals of visible party members, including violence at party headquarters and loss of jobs. I concur in the majority's conclusion that this evidence, viewed in its entirety, supports the conclusion that there will be a reasonable probability of harassment of contributors if their names are disclosed. This evidence is sufficiently linked to disclosure of contributors in large part because any person publicly known to support the SWP's unpopular ideological position may suffer the reprisals that this record shows active party members suffer, and the disclosure of contributors may lead the public to presume these people support the party's ideology.

---

of harm from disclosure is not required, ultimately the party must prove that the harm to it from disclosure of recipients outweighs the governmental interest in disclosure. This separately focused inquiry does not necessarily alter *Buckley*'s "reasonable probability" test or "flexible proof" standard. It does, however, plainly require a different result.

[8] See *Pullman-Standard* v. *Swint,* 456 U. S. 273, 289, n. 19 (1982). The majority does not clearly articulate the standard of review it is applying. By determining that the District Court "properly concluded" that the evidence established a reasonable probability of harassment, *ante,* at 100, the majority seems to apply an independent-review standard.

In contrast, the record, read in its entirety, does not suggest that disclosure of recipients of expenditures would lead to harassment of recipients or reprisals to the party or its members. Appellees gave no breakdown of the types of expenditures they thought would lead to harassment if disclosed. The record does contain the expenditure statements of the SWP, which itemize each expenditure with its purpose while usually omitting the name and address of the recipient. The majority of expenditures, both in number and dollar amount, are for business transactions such as office supplies, food, printing, photographs, telephone service, and books. There is virtually no evidence that disclosure of the recipients of these expenditures will impair the SWP's ability to obtain needed services.[9] Even if we assume that a portion

---

[9] The District Court admitted Exhibit 129 into the record, which is a certified copy of findings of fact made by the Federal Election Commission pursuant to a 1977 court order in *Socialist Workers 1974 National Campaign Committee* v. *Jennings*, No. 74–1338 (DC, stipulated judgment entered Jan. 3, 1979). The FEC in that case analyzed affidavits submitted by SWP members and other documentary evidence of public and private harassment of SWP members. In finding No. 126, the FEC accepted the SWP's proposed finding that in 1971 a landlady in San Francisco rejected the application of two SWP members for an apartment, because the FBI had visited the landlady and warned her of the dangers of the SWP. In finding No. 127, the FEC accepted the SWP's proposed finding that in 1974 a landlady in Chicago evicted a SWP member from her apartment. The landlady explained, "they told me all about you," refusing to identify who "they" were.

These two incidents are, of course, remote in time and place, and do not suggest that the party itself has had difficulty in finding office space. Nor do they suggest that the general public is likely to engage in similar activity. Moreover, the FBI's actions against the SWP have long been ended, see Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S. Rep. No. 94–755, Vol. 4–5, pp. 3–4 (1976), and Congress has since instituted more rigorous oversight of FBI and other intelligence activities, see 50 U. S. C. § 413 (1976 ed., Supp. IV). An inference from these two incidents that disclosure of recipients of expenditures would increase any difficulty the party might have in obtaining office space would be tenuous, and is plainly outweighed by the "substantial public interest in disclosure," *Buckley*, 424 U. S., at 72.

of expenditures went to temporary campaign workers or others whom the public might identify as supporting the party's ideology,[10] these persons have already publicly demonstrated their support by their campaign work. There is simply no basis for inferring that such persons would *thereafter* be harassed or threatened or otherwise deterred from working for the party by virtue of inclusion of their names in later expenditure reports, or that if any such remote danger existed, it would outweigh the concededly important governmental interests in disclosure of recipients of expenditures.

It is plain that appellees did not carry their burden of production and persuasion insofar as they challenge the expenditure disclosure provisions. I would therefore uphold the constitutionality of those portions of the Ohio statute that require the SWP to disclose the recipients of expenditures.[11]

---

[10] As the majority notes, *ante*, at 97, n. 12, some entries in the expenditure forms are designated as per diem, travel expenses, and room rental. At least until 1978, the expenditure statements gave the names of persons receiving per diem funds from the SWP. Apparently, party treasurers and party candidates received per diem payments. There is no evidence that filing these statements with the Ohio Secretary of State caused any harassment of the named persons, and indeed it is highly unlikely that this disclosure would increase the exposure of persons already so publicly identified with the party.

[11] In holding a state statute unconstitutional as applied, a court must sever and apply constitutional portions unless the legislature would not have intended to have applied "'those provisions which are within its power, independently of that which is not . . . ,'" *Buckley, supra,* at 108 (severing constitutional portions of Federal Election Campaign Act after holding other portions unconstitutional on their face), quoting *Champlin Refining Co. v. Corporation Comm'n of Okla.,* 286 U. S. 210, 234 (1932). Clearly, the expenditure disclosure requirements of the Ohio statute should be severed and applied even though the contribution disclosure requirements cannot be applied in this instance, for the two requirements are analytically and practically distinct.