Justice Alito,
concurring.
The Court holds that the disclosure under the Washington Public Records Act (PRA), Wash. Rev. Code §42.56.001 et seq. (2008), of the names and addresses of persons who sign referendum petitions does not as a general matter violate the First Amendment, ante this page, and I agree with that conclusion. Many referendum petitions concern relatively uncontroversial matters, see ante, at 200-201, and plaintiffs *203 have provided no reason to think that disclosure of signatory information in those contexts would significantly chill the willingness of voters to sign. Plaintiffs’ facial challenge therefore must fail. See ante, at 191, 194.
Nonetheless, facially valid disclosure requirements can impose heavy burdens on First Amendment rights in individual cases. Acknowledging that reality, we have long held that speakers can obtain as-applied exemptions from disclosure requirements if they can show “a reasonable probability that the compelled disclosure of [personal information] will subject them to threats, harassment, or reprisals from either Government officials or private parties.” Buckley v. Valeo, 424 U. S. 1, 74 (1976) (per curiam); see also Citizens United v. Federal Election Comm’n, 558 U. S. 310, 367 (2010); McConnell v. Federal Election Comm’n, 540 U. S. 93, 197-198 (2003); Brown v. Socialist Workers ’74 Campaign Comm. (Ohio), 459 U. S. 87, 93 (1982). Because compelled disclosure can “burden the ability to speak,” Citizens United, supra, at 366, and “seriously infringe on privacy of association and belief guaranteed by the First Amendment,” Buckley, supra, at 64, the as-applied exemption plays a critical role in safeguarding First Amendment rights.
I
The possibility of prevailing in an as-applied challenge provides adequate protection for First Amendment rights only if (1) speakers can obtain the exemption sufficiently far in advance to avoid chilling protected speech and (2) the showing necessary to obtain the exemption is not overly burdensome. With respect to the first requirement, the as-applied exemption becomes practically worthless if speakers cannot obtain the exemption quickly and well in advance of speaking. To avoid the possibility that a disclosure requirement might chill the willingness of voters to sign a referendum petition (and thus burden a circulator’s ability to collect the necessary number of signatures, cf. Meyer v. Grant, 486 U. S. *204 414, 423 (1988)), voters must have some assurance at the time when they are presented with the petition that their names and identifying information will not be released to the public. The only way a circulator can provide such assurance, however, is if the circulator has sought and obtained an as-applied exemption from the disclosure requirement well before circulating the petition. Otherwise, the best the circulator could do would be to tell voters that an exemption might be obtained at some point in the future. Such speculation would often be insufficient to alleviate voters’ concerns about the possibility of being subjected to threats, harassment, or reprisals. Cf. Citizens United, supra, at 484-485 (Thomas, J., concurring in part and dissenting in part).
Additionally, speakers must be able to obtain an as-applied exemption without clearing a high evidentiary hurdle. We acknowledged as much in Buckley, where we noted that “unduly strict requirements of proof could impose a heavy burden” on speech. 424 U. S., at 74. Recognizing that speakers “must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim,” we emphasized that speakers “need show only a reasonable probability” that disclosure will lead to threats, harassment, or reprisals. Ibid, (emphasis added). We stated that speakers could rely on a wide array of evidence to meet that standard, including “specific evidence of past or present harassment of [group] members,” “harassment directed against the organization itself,” or a “pattern of threats or specific manifestations of public hostility.” Ibid. Significantly, we also made clear that “[n]ew [groups] that have no history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views.” Ibid. From its inception, therefore, the as-applied exemption has not imposed onerous burdens of proof on speakers who fear that disclosure might lead to harassment or intimidation.
*205 II.
In light of those principles, the plaintiffs in this case have a strong argument that the PRA violates the First Amendment as applied to the Referendum 71 petition.
A
Consider first the burdens on plaintiffs’ First Amendment rights. The widespread harassment and intimidation suffered by supporters of California’s Proposition 8 provides strong support for an as-applied exemption in the present case. See Buckley, supra, at 74 (explaining that speakers seeking as-applied relief from a disclosure requirement can rely on “evidence of reprisals and threats directed against individuals or organizations holding similar views”). Proposition 8 amended the California Constitution to provide that “[o]nly marriage between a man and a woman is valid or recognized in California,” Cal. Const., Art. I, § 7.5, and plaintiffs submitted to the District Court substantial evidence of the harassment suffered by Proposition 8 supporters, see Declaration of Scott F. Bieniek in No. C:09-5456 (WD Wash.), Exhs. 12, 13. Members of this Court have also noted that harassment. See Hollingsworth v. Perry, 558 U. S. 183, 185-186 (2010) (per curiam); Citizens United, supra, at 481-482 (opinion of Thomas, J.). Indeed, if the evidence relating to Proposition 8 is not sufficient to obtain an as-applied exemption in this case, one may wonder whether that vehicle provides any meaningful protection for the First Amendment rights of persons who circulate and sign referendum and initiative petitions.
What is more, when plaintiffs return to the District Court, they will have the opportunity to develop evidence of intimidation and harassment of Referendum 71 supporters — an opportunity that was pretermitted because of the District Court’s decision to grant a preliminary injunction on count I of plaintiffs’ complaint. See 661 F. Supp. 2d 1194, 1205-1206 *206 (WD Wash. 2009); Tr. of Oral Arg. 40-41. For example, plaintiffs allege that the campaign manager for one of the plaintiff groups received threatening e-mails and phone calls, and that the threats were so severe that the manager filed a-complaint with the local sheriff and had his children sleep in an interior room of his home. App. 9-10.
B
The inadequacy of the State’s interests in compelling public disclosure of referendum signatory information further confirms that courts should be generous in granting as-applied relief in this context. See Buckley, supra, at 71 (recognizing that the weakness of the State’s interests in an individual case can require exempting speakers from compelled disclosure); Brown, 459 U. S., at 92-93 (same). As the Court notes, respondents rely on two interests to justify compelled disclosure in this context: (1) providing information to voters about who supports a referendum petition; and (2) preserving the integrity of the referendum process by detecting fraudulent and mistaken signatures. Ante, at 197.
1
In my view, respondents’ asserted informational interest will not in any case be sufficient to trump the First Amendment rights of signers and circulators who face a threat of harassment. Respondents maintain that publicly disclosing the names and addresses of referendum signatories provides the voting public with “insight into whether support for holding a vote comes predominantly from particular interest groups, political or religious organizations, or other group[s] of citizens,” and thus allows voters to draw inferences about whether they should support or oppose the referendum. Brief for Respondent Washington Families Standing Together 58; see also Brief for Respondent Reed 46-48. Additionally, respondents argue that disclosure “allows Washington voters to engage in discussion of referred measures with *207 persons whose acts secured the election and suspension of state law.” Id., at 45; see also Brief for Respondent Washington Families Standing Together 58.
The implications of accepting such an argument are breathtaking. Were we to accept respondents’ asserted informational interest, the State would be free to require petition signers to disclose all kinds of demographic information, including -the signer’s race, religion, political affiliation, sexual orientation, ethnic background, and interest-group memberships. Requiring such disclosures, however, runs headfirst into a half century of our case law, which firmly establishes that individuals have a right to privacy of belief and association. See Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U. S. 47, 69 (2006); Brown, supra, at 91; Buckley, 424 U. S., at 64; DeGregory v. Attorney General of N. H., 383 U. S. 825, 829 (1966); Gibson v. Florida Legislative Investigation Comm., 372 U. S. 539, 544 (1963); NAACP v. Alabama ex rel. Patterson, 357 U. S. 449, 462 (1958). Indeed, the State’s informational interest paints such a chilling picture of the role of government in our lives that at oral argument the Washington attorney general balked when confronted with the logical implications of accepting such an argument, conceding that the State could not require petition signers to disclose their religion or ethnicity. Tr. of Oral Arg. 37, 56.
Respondents’ informational interest is no more legitimate when viewed as a means of providing the public with information needed to locate and contact supporters of a referendum. In the name of pursuing such an interest, the State would be free to require petition signers to disclose any information that would more easily enable members of the voting public to contact them and engage them in discussion, including telephone numbers, e-mail addresses, and Internet aliases. Once again, permitting the government to require speakers to disclose such information runs against the current of our associational privacy cases. But more impor *208 tant, when speakers are faced with a reasonable probability of harassment or intimidation, the State no longer has any interest in enabling the public to locate and contact supporters of a particular measure — for in that instance, disclosure becomes a means of facilitating harassment that impermissibly chills the exercise of First Amendment rights.
In this case, two groups proposed to place on the Internet the names and addresses of all those who signed Referendum 71, and it is alleged that their express aim was to encourage “uncomfortable conversation^].” 661 F. Supp. 2d, at 1199 (internal quotation marks omitted). If this information is posted on the Internet, then anyone with access to a computer could compile a wealth of information about all of those persons, including in many cases all of the following: the names of their spouses and neighbors, their telephone numbers, directions to their homes, pictures of their homes, information about their homes (such as size, type of construction, purchase price, and mortgage amount), information about any motor vehicles that they own, any court case in which they were parties, any information posted on a social networking site, and newspaper articles in which their names appeared (including such things as wedding announcements, obituaries, and articles in local papers about their children’s school and athletic activities). The potential that such information could be used for harassment is vast.
2
Respondents also maintain that the State has an interest in preserving the integrity of the referendum process and that public disclosure furthers that interest by helping the State detect fraudulent and mistaken signatures. I agree with the Court that preserving the integrity of the referendum process constitutes a sufficiently important state interest. Ante, at 197. But I harbor serious doubts as to whether public disclosure of signatory information serves that interest in a way that always “reflect[s] the seriousness of the *209 actual burden on First Amendment rights.” Davis v. Federal Election Comm’n, 554 U. S. 724, 744 (2008).
First, the realities of Washington law undermine the State’s argument that public disclosure is necessary to ensure the integrity of the referendum process. The State of Washington first authorized voter initiatives via constitutional amendment in 1912, and the following year the Washington Legislature passed a statute specifying the particulars of the referendum process. See State ex rel. Case v. Superior Ct.for Thurston Cty., 81 Wash. 623, 628, 143 P. 461, 462 (1914). Significantly, Washington’s laws pertaining to initiatives and referenda did not then and do not now authorize the public disclosure of signatory information. See Wash. Rev. Code §29A.72.010 et seq.; 1913 Wash. Laws pp. 418-437. Instead, the public disclosure requirement stems from the PRA, which was enacted in 1972 and which requires the public disclosure of state documents generally, not referendum documents specifically. See Wash. Rev. Code §42.56.001 et seq. Indeed, if anything, Washington’s referenda and initiative laws suggest that signatory information should remain confidential: Outside observers are permitted to observe the secretary of state’s verification and canvassing process only “so long as they make no record of the names, addresses, or other information on the petitions or related records during the verification process,” §29A.72.230, and the State is required to destroy all those petitions that fail to qualify for the ballot, § 29A.72.200.
Second, the State fails to come to grips with the fact that public disclosure of referendum signatory information is a relatively recent practice in Washington. Prior to the adoption of the PRA in 1972, the Washington attorney general took the view that referendum petitions were not subject to public disclosure. See Op. Wash. Atty. Gen. 55-57 No. 274, pp. 1-2 (May 28,1956), online at http://www.atg.wa.gov/AGO Opinions/opinion.aspx?section=topic&id=10488 (all Internet materials as visited June 17, 2010, and available in Clerk of *210 Court’s case file) (declaring that public disclosure of initiative petitions would be “contrary to public policy” and would run contrary to “a tendency on the part of the legislature to regard the signing of an initiative petition as a matter concerning only the individual signers except in so far as necessary to safeguard against abuses of the privilege”). Indeed, the secretary of state represents on his Web site that even after the PRA was enacted, “various Secretary of State administrations took the position, from 1973 to 1998, that the personal information on petition sheets were NOT subject to disclosure.” B. Zylstra, The Disclosure History of Petition Sheets (Sept. 17, 2009), online at http://blogs.sos. wa.gov/FromOurCorner/index.php/2009/09/the-disclosurehistory-of-petition-sheets. Although the secretary of state apparently changed this policy in the late 1990’s, it appears that the secretary did not release any initiative petitions until 2006. Ibid. And to date, the secretary has released only a handful of petitions. Ibid.; App. 26. That history substantially undermines the State’s assertion that public disclosure is necessary to ensure the integrity of the referendum process. For nearly a century, Washington’s referendum process operated — and apparently operated successfully — without the public disclosure of signatory information. The State has failed to explain how circumstances have changed so dramatically in recent years that public disclosure is now required.
Third, the experiences of other States demonstrate that publicly disclosing the names and identifying information of referendum signatories is not necessary to protect against fraud and mistake. To give but one example, California has had more initiatives on the ballot than any other State save Oregon. See Initiative and Referendum Institute, Initiative Use, p. 1 (Feb. 2009), online at http://www.iandrinstitute.org/ IRI%20Initiative%20Use%20%281904=2008%29.pdf. Nonetheless, California law explicitly protects the privacy of initiative and referendum signatories. See Cal. Elec. Code *211 Ann. §18650 (West 2003); Cal. Govt. Code Ann. §6253.5 (West 2008). It is thus entirely possible for a State to keep signatory information private and maintain a referendum and initiative process free from fraud.
Finally, Washington could easily and cheaply employ alternative mechanisms for protecting against fraud and mistake that would be far more protective of circulators’ and signers’ First Amendment rights. For example, the Washington attorney general represented to us at oral argument that “the Secretary of State’s first step after receiving submitted petitions is to take them to his archiving section and to have them digitized.” Tr. of Oral Arg. 30. With a digitized list, it should be relatively easy for the secretary to check for duplicate signatures on a referendum petition. And given that the secretary maintains a “centralized, uniform, interactive computerized statewide voter registration list that contains the name and registration information of every registered voter in the state,” Wash. Rev. Code Ann. §29A.08.125(1) (West Supp. 2010), the secretary could use a computer program to cross-check the names and addresses on the petition with the names and addresses on the voter registration rolls, thus ensuring the accuracy and legitimacy of each signature.
Additionally, using the digitized version of the referendum petition, the State could set up a simple system for Washington citizens to check whether their names have been fraudulently signed to a petition. For example, on his Web site, the secretary maintains an interface that allows voters to confirm their voter registration information simply by inputting their name and date of birth. • See http://wei.secstate. wa.gov/osos/VoterVault/Pages/MyVote.aspx. Presumably the secretary could set up a similar interface for referendum petitions. Indeed, the process would seem to be all the more simple given that Washington requires a “unique identifier [to] be assigned to each registered voter in the state.” §29A.08.125(4).
*212 * * *
As-applied challenges to disclosure requirements play a critical role in protecting First Amendment freedoms. To give speech the breathing room it needs to flourish, prompt judicial remedies must be available well before the relevant speech occurs and the burden of proof must be low. In this case — both through analogy and through their own experiences — plaintiffs have a strong case that they are entitled to as-applied relief, and they will be able to pursue such relief before the District Court.