**CONSUMER PARTY, Max Weiner, Lance Haver, William Thorn, and Lisa Brennan**

v.

**William R. DAVIS, Secretary of the Commonwealth of Pennsylvania; Richard Anderson, Bureau of Legislation, Commissions and Elections; Margaret Tartaglione, Marion Tasko and John Kane, Commissioners of the City of Philadelphia.**

Civ. A. No. 85–0836.

United States District Court, E.D. Pennsylvania.

March 26, 1985.

Denial of Reconsideration April 9, 1985.

---

David Kairys, Stefan Presser, Philadelphia, Pa., for plaintiffs.

Carl Vaccaro, Philadelphia, Pa., for defendants.

## MEMORANDUM OF DECISION

SHAPIRO, District Judge.

Plaintiffs, the Consumer Party and several of its officers, candidates and members, sought preliminary and permanent injunctive and declaratory relief prohibiting the enforcement of Act 190 of 1984, 25 Pa.C.S.A. § 912.1, against the Consumer Party. There is jurisdiction over this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(1), (3), (4) and 2201.[1] Plaintiffs contended that the challenged state legislation, substantially increasing the number of signatures required to nominate candidates in the primary election, unconstitutionally deprives the Consumer Party of the right to participate in elections. Defendants City and Commonwealth responded that the Consumer Party has or will have a sufficient number of registered party members to place candidates for primary nomination in the Consumer Party name or to write them in on the primary ballot; if the number of registered party members is insufficient for these purposes, defendants stated that Consumer Party members and supporters could write-in their preferred candidates on the general election ballot.

The court heard testimony and issued an Order denying plaintiffs' motion on March 12, 1985. This Memorandum constitutes the findings of fact and conclusions of law in support of that Order.

We begin by considering the nature and extent of Pennsylvania's statutory scheme. The Pennsylvania Election Code, 25 Pa.C.S.A. § 2600 *et seq.*, establishes a two-tiered system of political associations for electoral purposes: political parties and political bodies. A state-wide political party is defined as an organization polling in the state as a whole, and in each of at least ten counties, not less than two percent of the largest entire vote cast for any state-wide candidate elected in the preceding general election, 25 Pa.C.S.A. § 2831(a); a political body is any other political association which nominates candidates for general elections, 25 Pa.C.S.A. § 2831(c). Any party or body, one of whose candidates polled at least five percent of the largest entire vote cast for any county candidate elected at either the general or municipal election preceding the primary, is a political party within that county, 25 Pa.C.S.A. § 2831(b).

Political parties must nominate all their candidates for office at primary elections, 25 Pa.C.S.A. § 2862, at which only those registered as members of a political party may vote, 25 Pa.C.S.A. § 2832.[2] The

---

1. At oral argument, the court rejected defendants' argument that it would be appropriate for this court to abstain. Abstention is proper only where a statute may be interpreted by the state judiciary in a way that would avoid the necessity of reaching a federal constitutional issue. *Kusper v. Pontikes,* 414 U.S. 51, 54–55, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973). Since Act 190 is clear on its face (and defendants offered no argument that another interpretation might be appropriate), "abstention would amount to shirking the solemn responsibility of the federal courts to guard, enforce and protect every right granted or secured by the Constitution of the United States," *Kusper,* 414 U.S. at 55, 94 S.Ct. at 306 (citations omitted).

2. No voter has a constitutional right to vote in a party primary or sign a primary nominating petition, *American Party of Texas v. White,* 415 U.S. 767, 785 n. 17, 94 S.Ct. 1296, 1308 n. 17, 39 L.Ed.2d 744 (1974), and either a state or political party may non-arbitrarily restrict the ability of voters to influence the nominating procedure by requiring a "closed" primary permitting voting only by party members or nominating petitions signed only by party members. *See Democratic Party of the United States v. Wisconsin ex rel. La Follette,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981) (party members have right to hold primary free from influence of non-members); *Swaney v. Alton,* 116 P.L.J. 109 (Cmwlth.

candidates who win a party primary are that party's nominees for office at the next general election. In order to qualify for a place on a party's primary ballot, a candidate must file a nomination petition signed by a requisite number of registered members of that party, 25 Pa.C.S.A. § 2868.[3] Although one signing a primary nominating petition must be a registered party member, a candidate need not be a party member unless he or she is seeking party office or selection as a party delegate to a nominating convention, 25 Pa.C.S.A. § 2868.

Title 25 Pa.C.S.A. § 2872, the predecessor to Act 190 of 1984, required, *inter alia,* primary nominating petitions to be signed by the following number of registered party voters:

| | |
|---|---|
| President and United States Senate | —100 in each of at least ten counties. |
| State-wide Office | —100 in each of five counties. |
| Representative in Congress and State Senator | —200 |
| State Legislature | —100 |
| City-Wide Office (first-class cities) | —100 |

Act 190 of 1984 substantially increases the required number of valid registered party members' signatures on nominating petitions:

| | |
|---|---|
| President and United States Senators | —2,000 |
| Governor | —2,000, including at least 100 from each of ten counties. |
| Other State-Wide Offices | —1,000, including at least 100 from each of five counties |
| Representative in Congress | —1,000 |
| State Senator | —500 |
| State Legislature | —300 |
| City-Wide Offices (first-class cities) | —1,000 |

These signatures must be gathered during a three-week period beginning the thirteenth Tuesday before the primary and ending the tenth Tuesday before the primary (since this year's primary will be held on May 21, 1985, this period was from February 19—March 12, 1985), 25 Pa.C.S.A. § 2868.

Primary nominees may also be selected by write-in votes. But write-in votes may not be certified for a candidate unless the total number of votes for that person is equal to or greater than the number of signatures required on a nomination petition for the particular office in question, 25 Pa.C.S.A. § 3155.

Political bodies may not use the primary election machinery for nomination of their candidates. Instead, a political body candidate is nominated directly for the general election ballot by submitting to the Secretary of the Commonwealth nomination papers containing a requisite number of signatures of qualified electors (regardless of party affiliation) in the electoral district where that individual is running for office, 25 Pa.C.S.A. § 2911(a). For state-wide offices, the number of signatures required is at least two percent of the largest entire vote cast for any elected state-wide candidate in the last preceding election, 25 Pa.C.S.A. § 2911(b). For non-state-wide offices, the number of signatures required is at least two percent of the largest entire vote cast in that electoral district for any officer, except a judge of a court of record, in the last preceding election, 25 Pa.C.S.A. § 2911(b). These signatures must be obtained during a period between the tenth Wednesday prior to the primary and the second Friday subsequent to the primary (March 20—May 31, 1985), 25 Pa.C.S.A. § 2913(b).

A political body candidate may, but need not be, a member of the political body nominating the candidate; a candidate may also be unaffiliated or independent. Multiple candidates for the same office representing the same political body are prohibited. The Secretary of the Commonwealth

---

Ct.1968) (party rules are binding upon its members).

**3.** These nominating petitions must be circulated by party members and each circulator must file an affidavit stating that each signer "signed with full knowledge of the contents of the petition," 25 Pa.C.S.A. § 2869.

or any county board of elections is required to reject nomination papers if:

the appellation set forth therein is identical with or deceptively similar to the words used by any existing party or by any political body which has already filed nomination papers for the same office, or if the appellation set forth therein contains part of the name, or an abbreviation of the name or part of the name of an existing political party, or of a political body which has already filed nomination papers for the same office.

25 Pa.C.S.A. § 2936.

However, a political body candidate cannot be a registered member of any party during the time beginning thirty (30) days before the primary and extending to the general or municipal election, 25 Pa.C.S.A. § 2911.1. Therefore, a candidate seeking nomination by a political body must file an affidavit stating that "he was not a registered and enrolled member of a party thirty (30) days before the primary held prior to the general or municipal election in that same year." 25 Pa.C.S.A. § 2911(e)(6). This "sore loser" provision has been described as a "laudable effort" to prevent disappointed candidates from bolting their party on the eve of or after losing a primary election and forming new political entities for the purpose of securing ballot access. *In re Owens*, 62 Pa.Cmwlth. 281, 436 A.2d 260, 262 (1981).

Political parties and political bodies also have different methods of nominating candidates for special elections. Political parties may nominate their candidates as provided by party rules; no nominating petition signatures are required, 25 Pa.C.S.A. § 2776 *et seq.* However, political bodies may nominate such candidates only by filing signed nomination papers. *Id.* Both parties and bodies are permitted to make substitute nominations in case of death or withdrawal of any candidate nominated for general or special election, 25 Pa.C.S.A. §§ 2784, 2939, 2940.[4]

The Pennsylvania Consumer Party is an outgrowth of a consumer organization founded by Max Weiner and others in Philadelphia in 1965. This organization sought to redress consumer grievances that were inadequately addressed by any existing governmental agency. In 1967, organization members, believing their goal of reducing consumer abuse in the marketplace would be promoted most effectively through political action, formed the Consumer Party.

For some time thereafter, the Consumer Party was a political body and nominated candidates for general election by securing the requisite number of signatures on nominating papers as required by the Pennsylvania election laws. While the Consumer Party's candidates were unsuccessful in winning office, the Consumer Party provided a vehicle for political debate and promoted women and minority candidates.

The Consumer Party achieved (and has retained)[5] party status in Philadelphia County in 1976, in Allegheny, Beaver and Centre Counties in 1980, and state-wide in 1982; it has since been included on the primary ballot as a party.

In 1977 the Consumer Party lacked sufficient registered members to obtain the necessary number of signatures under § 2872 (the predecessor to Act 190) to place candidates on the primary ballot. But the Consumer Party increased its membership suf-

---

**4.** With the obvious exception of the newly enacted Act 190, many of these provisions of the Pennsylvania election laws have previously been found to withstand federal and/or state constitutional scrutiny. *See, e.g., In re Owens*, 62 Pa.Cmwlth. 281, 436 A.2d 260 (1981) (upholding "sore loser" thirty-day disaffiliation requirement); *Salera v. Tucker*, 399 F.Supp. 1258 (E.D. Pa.1975), *aff'd,* 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976) (upholding signature requirements for independent candidates but striking requirement that signatures be obtained during period ending 218 days prior to the general election); *Shankey v. Staisey*, 436 Pa. 65, 257 A.2d 897 (Pa.S.Ct.1969) (upholding 25 Pa.C.S.A. § 3155 requiring minimum number of write-ins for certification).

**5.** Because determinations of which political associations qualify for party status are made after every general or municipal election, an organization's status as a party or body may change from year-to-year.

ficiently so that at that primary election it nominated a candidate by write-in votes.

Subsequent to that election and until the passage of Act 190, the Consumer Party had sufficient registered members to comply with the signature requirements of § 2872 and nominate candidates in the primary. But Act 190 has made it impossible either absolutely (where the number of signatures required by Act 190 is more than the total number of registered party members) or practically (where the number of signatures required is an extremely high percentage of registered party members) for the Consumer Party to obtain enough signatures to put its candidates on the primary ballot.

As of November 6, 1984, the number of Consumer Party members state-wide was estimated at only 3,886 as compared to 2,487,652 registered Republicans and 3,380,675 registered Democrats. *See* Plaintiffs' Exhibit B. As of February 26, 1985 in Philadelphia County, the area where the Consumer Party has its strongest representation, there were 1,467 registered Consumer Party members as compared to 867,967 registered Democrats, 198,411 registered Republicans, and 26,896 registered either as Independents or as members of another political association. Thus, while a candidate for city-wide office in Philadelphia would need one-tenth of one percent of Democratic party-member signatures or write-in votes for nomination, he or she would need 69% of the signatures or write-in votes of Consumer Party members.

▪ It is well established that the party moving for a preliminary injunction has the burden of proof and must show (1) a reasonable probability of eventual success on the merits, and (2) that irreparable injury *pendente lite* will occur if relief is not granted. Additionally, the court should consider wherever relevant, (3) the possibility of harm to other interested persons

from the grant or denial of injunctive relief, and (4) the public interest. *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137 (3d Cir.1982); *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811 (3d Cir.1978). In balancing these competing concerns, the court must consider the extraordinary nature of injunctive relief:

> [a]n injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable.... The basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.

*Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (citations omitted).

Plaintiffs allege a substantial likelihood of success on the merits and irreparable injury because Act 190 effectively denies the Consumer Party the opportunity to hold a party primary and, because a party must nominate by primary, also bars it from any alternative routes of access to the general election ballot.

▪ Numerous Supreme Court opinions considering the validity of laws regulating ballot access make clear that voters, political parties,[6] and, to a lesser extent, candidates have protected constitutional rights. The right to vote in a general election is a "fundamental political right ... preservative of all rights." *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). State laws which restrict the franchise, such as durational residency or pre-election registration requirements, are subject to strict scrutiny. *See Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972). The right to form political associations derives from the First Amendment guarantee

---

**6.** In discussing federal authority, unless otherwise stated, the term political party refers generally to any political association or organization dedicated toward promoting particular views and candidates. In discussing the Pennsylvania election laws and their application, the term

political party will continue to be used more narrowly to refer to a political association which does have sufficient demonstrated electoral appeal to qualify for the privilege and obligation of holding primaries in contrast to a political body which does not.

of rights to freedom of speech, petition for redress of grievances, and peaceable assembly. *See Cousins v. Wigoda*, 419 U.S. 477, 487, 95 S.Ct. 541, 547, 42 L.Ed.2d 595 (1975) (party and its supporters have constitutional right of political association). This country's representative and elective system of government necessitates that "a basic function of a political party is to select the candidates for public office to be offered to the voters at general elections," *Kusper v. Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973).[7]

■ Since voters can express their political preferences only through candidates, whether party or independent, ballot access is intertwined with the rights of voters and entitled to protection. *See Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974) (invalidating state law denying candidacy to one unable to pay a filing fee). Laws which restrict ballot access by imposing party and candidate qualifications must be able to pass constitutional challenge on two related grounds: first, that rights of political association and voting are impermissibly burdened in violation of the First and Fourteenth Amendments; and second, that small political parties and their members and candidates are

improperly discriminated against in violation of the Equal Protection Clause of the Fourteenth Amendment.

Over the past two decades, the Supreme Court has frequently addressed the applicable standard of review for ballot access restrictions. Though endorsing at times both the strict scrutiny and rational relationship tests,[8] the Court now recognizes that, "constitutional challenges to specific provisions of a state's election laws [cannot] be resolved by any litmus-paper test that will separate valid from invalid restrictions." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974) (upholding disaffiliation requirement and remanding to district court to determine whether five percent signature requirement from restricted pool of eligible signers was unconstitutional).

In *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), holding Ohio's early filing deadline unconstitutionally denied John Anderson a place on the general election ballot, Justice Stevens for the Court[9] announced a pragmatic multi-factor balancing test to be applied in ballot access cases:

7. Though any individual's personal right to candidacy is not itself a fundamental right, *see Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), a critical ingredient of the electorate's ability to vote effectively is choice among candidates with demonstrated support. For this reason, everyone unaffiliated with a political party must be free to seek a place on the general election ballot provided that he or she is able to demonstrate some level of voter support (in order to protect the state's compelling interest in non-frivolous candidacies and manageable election ballots). "[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Storer v. Brown*, 415 U.S. 724, 745, 94 S.Ct. 1274, 1286, 39 L.Ed.2d 714 (1974). The ability of voters to write-in a candidate's name is not an adequate substitute for actually appearing on the ballot because "[t]o force a candidate to rely on write-ins is to burden him with disability. It makes it more difficult for him to get elected, and for the voters to elect him." *Williams v. Rhodes*, 393 U.S. 23, 37, 89 S.Ct. 5, 13, 21 L.Ed.2d 24 (1968) (Douglas, J., concurring).

8. *See Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (strict scrutiny standard); *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (rational relationship test); *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) and *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (applying mix of strict and minimal scrutiny); and *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (limiting strict scrutiny to classifications based on wealth and those making it virtually impossible for any but the two major parties to achieve ballot positions). *See generally* L. Tribe, *American Constitutional Law* § 13–20 (1978); *Developments in the Law—Elections*, 88 Harv.L.Rev. 1111, 1130–44 (1975).

9. Though Justice Rehnquist joined by Justices White, Powell and O'Connor dissented, they did not take issue with Justice Stevens' balancing test, 460 U.S. at 806, 103 S.Ct. at 1579 (Rehnquist, J., dissenting).

It [the Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570. Although the *Anderson* Court considered only a First Amendment violation, it relied on prior election cases resting on the Equal Protection Clause. *Anderson,* 460 U.S. at 786–87 n. 7, 103 S.Ct. at 1569 n. 7. The Court did not overrule other ballot access cases but deemed its prior results correct under the balancing test now required.[10]

Restrictions upon access to the primary ballot raise constitutional issues similar to those in general election ballot access cases and require this same legal analysis.[11] *See Developments in the Law—Elections,* 88 Harv.L.Rev. 1111, 1180–81 (1975). *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), is the Supreme Court's most comprehensive decision regarding state nominating procedures. The Court there examined Texas' electoral scheme providing four alternative methods for securing a place on the general ballot (running the gamut from required primary elections for the larger political

associations to conventions and petition drives for the smaller) and recognized the strong state interest in regulating the number of candidates on the primary ballot, *American Party,* 415 U.S. at 782 n. 14, 94 S.Ct. at 1306 n. 14. *See Lubin,* 415 U.S. at 712–13, 94 S.Ct. at 1318 (noting state interest in limiting the size of the ballot to "minimize voter confusion," "curb ballot flooding," and "prevent the overwhelming of voting machines"). Based on a factual analysis of candidates' past experience in achieving primary ballot access as well as the "obvious differences in kind" between large and small or new parties, *see Jenness v. Fortson,* 403 U.S. 431, 441–42, 91 S.Ct. 1970, 1975–76, 29 L.Ed.2d 554 (1971), the Court held the burdens on the associational and equal protection interests of smaller parties were there outweighed by the state's vital interest in limiting the size of the ballot to ensure the integrity of its electoral process.

The Supreme Court also relied on a multi-factor balancing analysis in *Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). A three-judge district court had relied on the Supreme Court's summary affirmance in *Salera v. Tucker,* 399 F.Supp. 1258 (E.D.Pa.1975), *aff'd,* 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976) (upholding signature requirements for independent candidates but striking requirement that signatures be obtained during 21-day period ending 218 days prior to the general election), in holding Maryland's early filing deadline unconstitutional as applied to independent candidates. The Supreme Court reversed and remanded because the district court had failed to make its own independent examination of the merits in light of evidence that during the years in which the Maryland filing deadline

---

**10.** However, the dissenting opinion questioned the continuing authority of *Storer* in light of the Court's decision. *See Anderson,* 460 U.S. at 811–19, 103 S.Ct. at 1581 (Rehnquist, J., dissenting) (finding "obvious" similarities between the effect of the Ohio filing deadline and the California disaffiliation statute).

**11.** This same analysis may also apply to special elections. *See Illinois Elections Bd. v. Socialist*

*Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (holding political subdivision's five percent signature requirement for independent candidates and new political parties violative of the Equal Protection Clause insofar as it required more than the 25,000 signatures required for candidates to appear on state-wide ballots).

was in effect, no independent candidate for state-wide office had ever succeeded in qualifying for the ballot. The trial court was required to make findings with regard to the burden on ballot access and the extent to which other features of the Maryland electoral system moderated that burden to determine, in the light of past experience, whether the burden on independent candidates' ballot access was unconstitutional. It is clear that the constitutional standards must be applied on the totality of facts of record.

Therefore, to resolve the constitutional problems potentially posed by the enactment of Act 190, we must apply the Supreme Court's *Anderson* test. The first issue is whether this Act alone unconstitutionally denies ballot access if those that Act 190 effectively prohibits from the party primary were to have a reasonable alternative route to the general election ballot. On finding that Act 190 itself is constitutional, the next issue is whether the Act's interaction with the remainder of the Pennsylvania Election Code provides an unconstitutional result in fact by denying reasonable alternative access to the general election ballot.

We begin by exploring the character and magnitude of the constitutional injury caused by Act 190. Prior to its enactment, there were two requirements for access to a primary ballot: first, a political association had to meet the definition of a party by polling the requisite number of general election votes state- and county-wide; second, a party had to demonstrate that a proposed party candidate had a sufficient modicum of party support by obtaining a specified number of signatures. The constitutionality of this prior scheme is not in doubt.

Act 190 increases the number of party members' signatures required to place a candidate's name on the primary ballot. With regard to the major parties, the re-

quirement imposes a *de minimus* burden. One thousand signatures (the number required for most state-wide offices) represents less than .04% of the total number of registered Democrats and Republicans. With regard to the Consumer Party, Act 190's requirements are far more onerous; as previously noted, the Consumer Party would likely be barred from most primary ballots.

But assuming that Consumer Party candidates have alternative routes to the general election ballot, the actual impact of Act 190 on the constitutional rights of those claiming to be effectively disenfranchised by it is not great. There is no constitutional right to primary participation, *see American Party*, 415 U.S. at 781, 94 S.Ct. at 1306. The Supreme Court has upheld substantially more burdensome restrictions than Pennsylvania's where there were alternative methods of nominating candidates similarly protective of an organization's associational and equal protection interests. *See Jenness*, 403 U.S. at 439, 91 S.Ct. at 1974. (upholding Georgia's political body and independent signature requirements; no challenge to aspect of law defining political parties as organizations receiving at least 20% of the vote at the most recent presidential or gubernatorial election and allowing only political parties to hold primaries).

The Supreme Court stated in *American Party*, "[a]ppellants' burden is not satisfied by mere assertions that small parties must proceed by convention when major parties are permitted to chose their candidates by primary elections." *American Party*, 415 U.S. at 781, 94 S.Ct. at 1306.[12] The Court concluded that Texas' four-tiered scheme for obtaining access to the primary ballot, "affords minority political parties a real and essentially equal opportunity for ballot qualification. Neither the First and Fourteenth Amendments nor the Equal Protec-

---

**12.** The same reasoning applies if the small party must proceed by general election nominating petitions. Nomination by primary election may actually be more not less burdensome for small parties than nomination by convention or peti-

tion. *See Jenness*, 403 U.S. at 438, 91 S.Ct. at 1974 (praising Georgia for not imposing upon a small or new party "the Procrustean requirement of establishing elaborate primary election machinery.")

tion Clause of the Fourteenth Amendment requires any more." *Id.* at 788, 94 S.Ct. at 1309.

The vital state interest in alleviating ballot clutter and thereby reducing voter confusion must be balanced against this comparatively low burden on the Consumer Party's constitutional rights. *See American Party,* 415 U.S. at 782 and n. 14, 94 S.Ct. at 1306 and n. 14. The evidence demonstrates the legitimacy of this governmental concern. The Democratic Special Primary ballot from May 15, 1979 listed 101 candidates for Councilman-at-Large. In an extreme example of ballot clutter, the May 15, 1983 Municipal Primary and Special Election ballot listed 299 candidates for Judge of the Court of Common Pleas. (Each voter could vote for 39 of these candidates.) Government witness Frederick L. Voigt, Executive Secretary of the Committee of 70, a civic organization, testified that voters have complained about the length and complexity of ballots, as well as the long wait to use voting machines and their frequent breakdowns.

Though the legislature did strip the Consumer Party of its recently acquired status as a party with a primary, there is no evidence that the legislature had the illegitimate motive of invidiously discriminating against the Consumer Party. The legislature's debates reflect only a desire to limit frivolous candidates and reduce voter confusion.[13] Representative Street, for example, stated that "[t]he [then-existing] low threshold, like 100 merely encourages frivolous candidates; it encourages incumbents to drum up candidates to clutter the ballots; it encourages many of the petty practices for which we in politics are criticized."[14] During this September 26, 1984 debate, the House defeated three proposed amendments to Senate Bill 387 (which became Act 190) to moderate the increase in required signatures without making any reference to the likely impact the higher requirements would have on small parties.[15]

In a footnote to *American Party,* the Supreme Court noted:

> At oral argument, counsel for appellants maintained that the Texas legislature raised the automatic ballot qualification figures to 20% after the La Raza Unida Party gubernatorial candidate polled more than 2% of the total vote in the 1972 general election. Counsel further intimated that the law will be changed again should a minority party fulfill the new requirements. Whatever their merits, we do not reach these contentions.

*American Party,* 415 U.S. at 772 n. 4, 94 S.Ct. at 1301 n. 4. In *Anderson,* the Supreme Court stated that "because the interests of minor parties and independent candidates are not well represented in state legislatures, the risk that the First Amendment rights of those groups will be ignored in legislative decisionmaking may warrant more careful judicial scrutiny." 460 U.S. at 793 n. 16, 103 S.Ct. at 1572 n. 16.[16] In the absence of any evidence of legislative animus, this court need not decide whether a statute restricting primary access might be invalid because it was unconstitutionally motivated.

■ Balancing Act 190's burden on the constitutional rights of the Consumer Party and its members against the vital state goal of protecting the integrity of its electoral process, and noting the absence of

---

**13.** Legislative Journal—House (September 26, 1974 at pp. 2015–17).

**14.** *Id.*

**15.** *Id.*

**16.** The Court cited J. Ely's book, *Democracy and Distrust: A Theory of Judicial Review* 73–78 (1980), which sets forth a motive based test of constitutional analysis. According to Ely, where a legislature acts to withhold a constitutionally gratuitous benefit that it had previously provided, a judicial analysis of the legislature's motivation is appropriate. *Id.* at 145. *See also Brown v. Socialist Workers '74 Campaign Committee* (Ohio), 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (holding First Amendment violated by Ohio law requiring disclosure of contributors to and recipients of minor parties' campaign funds where such disclosure might subject those identified to the "reasonable probability of threats, harassment or reprisals").

legislative ill-will toward the Consumer Party, the court finds that the state interest warrants the restriction Act 190 imposes upon plaintiffs' interests. Even if Act 190 effectively deprives the Consumer Party of party status for purposes of nominating candidates,[17] this law is constitutional so long as there exists a reasonable alternative means for Consumer Party candidates to reach the general election ballot.

Having determined that Act 190 is itself constitutional, we now apply the *Anderson* test to the totality of the Pennsylvania Election Code, including of course Act 190, and analyze the constitutionality of the entire electoral scheme.

> The concept of "totality" is applicable ... in the sense that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights.

*Storer*, 415 U.S. at 737, 94 S.Ct. at 1282. Such "impermissible barriers" consist of restrictions on access to the general election ballot that unconstitutionally infringe upon the Consumer Party's protected rights.

The totality of the Pennsylvania Election Code results in the following: a political party must nominate by primary. If Consumer Party candidates fail to obtain a sufficient number of signatures to comply with Act 190 (as most surely would, *see supra* pp. 1012–1013), the primary ballot would contain the Consumer Party name but no candidates would be listed. Candidates could be nominated in the primary election only if the Consumer Party registered enough new members to produce a sufficient number of write-in votes. In the likely event that this method failed to produce Consumer Party nominees, the general election ballot would list the Consumer Party name but no candidates. Voters would be able to write-in an individual of their choice on this ballot.

Alternatively, candidates seeking the support of Consumer Party members could circulate nominating petitions among all registered voters and gain a place on the general election ballot, but any such candidates would have to resign any party membership thirty (30) days prior to the primary election because the nomination papers could not be filed by the member of any existing party or on its behalf. Thus, this method prohibits candidates formally affiliated with the Consumer Party.

■ It is readily apparent that with the enactment of Act 190, the total Pennsylvania electoral scheme violates "the rights of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. at 24, 30, 89 S.Ct. at 7, 10 (1968) (invalidating Ohio law making it virtually impossible for any but Democrats and Republicans to qualify for the general ballot). The right of association is impermissibly infringed by election laws that in effect require a political organization either to increase or decrease its membership to participate in elections. The Equal Protection Clause is also implicated because this infringement operates only on political organizations large enough to qualify for party status but too small to meet the signature requirements of Act 190.

To avoid this effective bar from the electoral process, the Consumer Party has very limited forms of redress: it could either encourage voters to register in the Consumer Party or discourage votes cast for it in the general election and regain political body status. Each of these "forced" options violates the associative rights of a group of people joined together to further a particular purpose. A party may not be essentially required to broaden its message or appeal in an effort to increase its mem-

---

**17.** The Consumer Party would retain party status for other purposes, including listing on voter registration cards, general election ballots and primary ballots. But the latter would include only the party name; no candidates would be listed. There would exist the possibility of primary nomination through write-ins if the Consumer Party were able to increase its membership sufficiently. *See* 25 Pa.C.S.A. § 3155.

bership; a group's associative rights depend on having as members only those who share a particular vision and collective purpose. *See, Fraenzl v. Secretary of Commonwealth of Pennsylvania,* 83 Pa. Cmwlth. 539, 478 A.2d 903, 906 (1984) ("Indeed, were such an affirmative duty to seek registration of party supporters imposed by the [Election] Code, we doubt that it would pass constitutional muster.") Furthermore, even if the Consumer Party wished to increase its membership, it is exceedingly difficult, as organizer Max Weiner testified, to persuade voters to register in a small party and forego the political and patronage advantage of Democratic or Republican party membership.

A political organization's First Amendment rights are impermissibly infringed if it must attempt to drive away general election voters in order to keep its general election vote under two percent and regain body status. Similarly, to require the Consumer Party's preferred candidates to run as unaffiliated with it violates the basic goal of political associations: the opportunity to choose and support party standard bearers. An unaffiliated candidate could support the views of the Consumer Party; however, because party identification is a critical aspect of American politics, such required disaffiliation constitutes a "substantial restraint" and a "significant interference" with the exercise of constitutional rights, *Kusper,* 414 U.S. at 58, 94 S.Ct. at 308.

The state contended that plaintiffs' party status would be constitutionally protected because the party name would appear on both the primary and general ballots, and voters could write-in the candidates of their choice. However, the Supreme Court has indicated the inadequacy of the write-in alternative.

The realities of the electoral process, however, strongly suggest that "access" via write-in votes falls far short of access in terms of having the name of the candidate on the ballot.... [A candidate] relegated to [the] write-in provision, would be forced to rest his chances solely upon those voters who would remember his name and take the affirmative step of writing it on the ballot.

*Lubin,* 415 U.S. at 719 n. 5, 94 S.Ct. at 1321 n. 5.

Having evaluated the nature and likely effect of the Election Code, as amended, on the Consumer Party, we now examine the Government's justifications for this scheme. Under the *Anderson* test, we "consider the extent to which those [state] interests make it necessary to burden the plaintiff's rights." *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570. Admittedly, the state has a vital interest in ensuring the integrity of its elections and may rightfully require that potential candidates demonstrate a modicum of voter support. But in this instance, the nature of the burden on the Consumer Party's constitutional rights demands that the state's regulations be the least restrictive means of protecting this legitimate state interest.[18]

The Pennsylvania legislature could have protected its interest in ballot integrity without denying the Consumer Party's constitutional rights by ensuring that the Consumer Party did not fall into a no-man's-land between the nominating procedures required of a political party and those of a political body. As *American Party* makes abundantly clear, the legislature could permissibly choose to treat the Consumer Party as either a party or a body for nominating purposes. The Texas scheme upheld in *American Party* barred political organizations polling less than two percent of the total gubernatorial vote in the preceding

**18.** This demand is, of course, comparable to the strict scrutiny standard. The *Anderson* balancing test requires a more compelling state interest to justify substantial restrictions on political parties' constitutional rights than is required to justify mild restrictions. *See Kusper,* 414 U.S. at 58–59, 94 S.Ct. at 308 ("... a signifi-

cant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest.... For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." (citations omitted)). *See also,* Tribe *supra* note 8 at §§ 13–22.

general election from primary participation. But these organizations could nominate candidates by convention and, if the required support was not evidenced at the conventions, by petition. *See American Party,* 415 U.S. at 774, 94 S.Ct. at 1302. Because these methods would protect Pennsylvania's legitimate interest without disenfranchising the Consumer Party, the court finds that the individually valid provisions of the Pennsylvania election code operate together to produce, at least with regard to the Consumer Party, an unconstitutional result.

Since plaintiffs' case is virtually certain to succeed on the merits, we must now consider whether denying injunctive relief would cause irreparable harm. The Consumer Party will lose its political voice if unable to place identified party candidates on the general election ballot. Party members will be deprived of their legitimate right to vote for a representative candidate. *See Williams* 393 U.S. at 31, 89 S.Ct. at 10 ("the right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast for only one of two parties at a time when other parties are clamoring for a place on the ballot.") Furthermore, the Consumer Party will almost certainly be relegated to body status, since a write-in candidate would be extremely unlikely to receive as much as two percent of the total vote. These effects constitute irreparable harm.

But the precise issue with regard to granting injunctive relief is whether invalidating Act 190 is the appropriate remedy. The court concluded it was not an appropriate remedy because other remedies intrude less upon the state electoral process; therefore, plaintiffs' motion for a preliminary injunction was denied.

Pennsylvania courts have used their equitable powers to fashion appropriate remedies in election cases, including ordering the placement of a candidate's name or office on the ballot, *see In re Nomination*

*Papers of Smith,* 494 Pa. 140, 430 A.2d 1156 (Sup.Ct.1981) (*per curiam* ) (reversing the Commonwealth Court, 60 Pa.Cmwlth. 150, 431 A.2d 1096 (1981); *Barbieri v. Shapp,* 476 Pa. 513, 383 A.2d 218 (1978); *see also Salera v. Tucker,* 399 F.Supp. 1258 (E.D.Pa.1975), *aff'd,* 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1979) (enjoining the enforcement of early filing deadline in view of number of signatures required in short period of time far in advance of general election). *Cf. Bentman v. Seventh Ward Democratic Executive Committee,* 421 Pa. 188, 218 A.2d 261 (1966) (holding that court has jurisdiction over mandamus action by persons elected as party officials at primary election but removed from office by party executive committee). In this instance, there are various forms of relief that might be afforded the Consumer Party to ensure that its candidates have access to the general election ballot.

The court could invalidate Act 190, at least for the Consumer Party, and reinstate the former signature requirements (the Consumer Party would then require the three weeks provided by law to obtain the necessary number of signatures). But the court could uphold Act 190 and provide another form of relief instead. Possibilities include invalidating 25 Pa.C.S.A. § 3155, at least for the Consumer Party, and permitting the Consumer Party to nominate the individual receiving the highest number of write-in votes on the primary ballot; or invalidating 25 Pa.C.S.A. § 2862, at least for the Consumer Party, and permitting its primary candidates to be nominated at party conventions.

Alternatively, the court could view Act 190 as imposing a legitimate restriction on parties holding primaries, *provided that any party unable to obtain the required signatures would have access to the general election ballot in the same manner as a political body.* For this solution to protect the constitutional rights of the Consumer Party and its members, nomination papers in the name of the Consumer Party and candidates retaining party membership must be allowed. Any of these forms of

88

relief would guarantee general election ballot access to the Consumer Party.[19] For several reasons, providing the Consumer Party with political body status *for nomination purposes only* is the most appropriate court enforced remedy.[20]

First, the political body solution is limited to relief that is constitutionally compelled (rather than constitutionally permitted) and, therefore, least intrudes upon the legislature's electoral scheme. *See Whitcomb v. Chavis*, 403 U.S. 124, 160, 91 S.Ct. 1858, 1877, 29 L.Ed.2d 363 (1971) ("Even if the District Court was correct in finding unconstitutional discrimination against poor inhabitants of the ghetto, it did not explain why it was constitutionally compelled to disestablish the entire county district and to intrude upon state policy any more than necessary ..."). By raising the signature requirements for primary petitions, legislators presumably were aware that fewer political organizations might be able to nominate through party primaries and that more might have to file general election nominating papers. The legislature has given no indication that it was prepared to accept a completely new alternative such as nomination by either convention or a lesser number of write-in votes than presently required.

The political body solution does not provide the Consumer Party with special advantages but ensures that a Consumer Party candidate may qualify for the general election ballot. The Supreme Court in *Storer* emphasized the importance of past experience in determining the legitimacy of signature requirements. "Past experience will be a helpful, if not always unerring guide ...," *Storer*, 415 U.S. at 742, 94 S.Ct. at 1285. Based on Max Weiner's testimony, the court is aware that on numerous occasions the Consumer Party successfully obtained a sufficient number of signatures to nominate candidates as a political body.

Second, the political body solution involves only the logical interpretation of existing election laws rather than the invalidation of laws.[21] "Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible," *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982). Title 25 Pa.C.S.A. § 2862 states that all political party candidates shall be nominated at primaries. It is reasonable to read this to refer only to parties able to meet the legal requirements for a primary. Title 25 Pa.C.S.A. § 2911(e)(6), the "sore loser" provision, restricts political body candidates to those unaffiliated with a political party at least thirty days before a primary. There is no logical purpose to be served by prohibiting political body candidacy of a political party member who was not a candidate because his or her party did not hold a primary; such a candidate is not

19. The Pennsylvania legislature could also act to remedy the constitutional deficiencies in the Electoral Code. Because the Consumer Party is not directly responsible for ballot clutter, the legislature might require all primary nominating petitions to contain the signatures of a particular percentage of party members registered as of a certain date. Then, the number of necessary signatures would bear a consistent relationship to the total pool of eligible signers. But it is not the role of this court to question the wisdom of a constitutional legislative enactment.

There is also no need to consider whether the court can fashion rules for one party different from rules for others and, if so, what those rules should be. For example, striking Act 190 as to the Consumer Party only would require the court to decide what modicum of support a Consumer Party candidate should show to achieve a place on the primary ballot. In some cases involving new or small political parties, special rules have been enforced where necessary to counter hostility or threats of harassment. *See Brown v. Socialist Workers '74 Campaign Committee* (Ohio), 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982). But it is preferable for reasonable classifications consistent with legitimate state interests to be made by the legislature so long as they are rational and do not overburden access to the ballot or discriminate unconstitutionally.

20. The Consumer Party has not yet attempted to use the political body nominating route but to explain this court's upholding of Act 190, we must state the enforceability of another solution.

21. It would be advantageous if these laws were revised to comport with the interpretation necessary to avoid their constitutional invalidity.

a "sore loser" if he or she was not or could not have been in a party primary contest. Section 2911(e)(6) must be interpreted to read: "that in the case where he is a candidate for election at a general or municipal election, he was not a registered and enrolled member of a party *nominating candidates in the primary* thirty (30) days before *that party's* [the] primary held prior to the general or municipal election in that same year." (Underlined words added and bracketed word omitted by this court).

Title 25 Pa.C.S.A. § 2936, which prohibits political body nominations made in the name of political parties, is intended to prevent both a defeated primary candidate from appearing on the ballot under a party label and any candidates from being nominated by more than one political organization. *See Packrall v. Quail,* 411 Pa. 555, 192 A.2d 704 (Sup.Ct.1963). Section 2936 must be interpreted to apply only to parties that actually nominate candidates in a primary election and to bar general election nominating petitions only where

> ... the appellation set forth therein is identical with or deceptively similar to the words used by any existing party holding a primary, or by any political body or party not holding a primary which has already filed nomination papers for the same office, or if the appellation set forth therein contains part of the name, or an abbreviation of the name or part of the name of a[n existing] political party holding a primary, or of a political body or party not holding a primary which has already filed nomination papers for the same office.

(Underlined words added and bracketed words omitted by this court).

Third, the political body solution has already been adopted by a Pennsylvania court. In *Fraenzl,* 478 A.2d 903 (Cmwlth. Ct.1984), the Commonwealth Court considered a similar situation. The Socialist Workers Party had received a sufficient number of general election votes to qualify as a party in Washington County but lacked enough registered members to sign primary nominating petitions. A Socialist Workers Party candidate used the political body route to obtain a sufficient number of voter signatures to earn a place on the general election ballot; however, the Secretary of the Commonwealth rejected her petitions because the nominating papers used the Socialist Workers party name. Determining that the legislature could not have intended to require use of the primary process where such use was impossible, the court ordered the Secretary of the Commonwealth to place this candidate's name on the general election ballot as the Socialist Workers Party candidate. "We are constrained to interpret the Election Code to avoid both unconstitutional and absurd results .... To interpret the Code as urged by the Respondents [the state] results in a 'Catch-22' which cannot have been intended by the legislature." *Fraenzl,* 478 A.2d at 906.[22]

However, *Fraenzl* was a case where the "number of votes [made] it impossible for a candidate to utilize that [primary] process." *Id.* In the Consumer Party situation, while it would often be impossible to hold a contested primary, it would sometimes be theoretically possible for one candidate to obtain the signatures necessary for nomination on a primary ballot. But we are convinced that requiring Consumer Party candidates to procure so large a percentage of party members' signatures is practically impossible and therefore would place an unconstitutional burden on the party. The Consumer Party would have to obtain signatures from well over one-half its members in Philadelphia county. *See Storer,* 415 U.S. at 739, 94 S.Ct. at 1283 (noting that requiring signatures from substantially more than five percent of a restricted voter pool would be in excess of anything the Court has approved).[23]

---

**22.** The *Fraenzl* Court ignored 25 Pa.C.S.A. § 2911(e)(6), the "sore loser" provision, though it had already been enacted.

**23.** We do not here consider the situation where a party has substantially more members than the Consumer Party but substantially fewer than the Democratic and Republican parties.

Heeding the Court's admonition in *Stor-er* that a court must thoroughly explore the relevant facts and circumstances, we find additional evidence that collecting sufficient Consumer Party members' signatures to participate in the primary is in effect impossible. Plaintiffs' testimony convinced the court that Consumer Party members are not highly accessible to circulators of petitions; petitions may not be circulated by mail and must be signed in the presence of the circulator, who must be a qualified elector of the Consumer Party (unless the petition is for nomination of a judicial candidate), 25 Pa.C.S.A. § 2869. Consumer Party members are widely dispersed throughout many counties. In Philadelphia, where the Consumer Party's concentration is highest, there was testimony that many members do not have telephones and that this hinders successful circulation of petitions.

Unless the Consumer Party participates in the general election via the political body nominating procedure, the party will be deprived of ballot access in violation of the First and Fourteenth Amendments to the United States Constitution. The relief suggested herein "in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life," *Jenness,* 403 U.S. at 439, 91 S.Ct. at 1974. If the Consumer Party's registration increases sufficiently, the party will again be able to nominate by primary. Therefore, this court denied plaintiffs' motion for a preliminary injunction invalidating Act 190, but retained jurisdiction to ensure the Consumer Party's access to the general election ballot. It has been so ordered.