**Beverly C. DAGGETT, et al., Plaintiffs,**

v.

**Peter B. WEBSTER, et al., Defendants.**

**No. CIV. 98–223–B–H.**

United States District Court,
D. Maine.

Nov. 5, 1999.

54

Nathaniel M. Rosenblatt, Farrell, Rosenblatt & Rusell, Bangor, ME, Mark Lopez, American Civil Liberties Union, New York City, for Plaintiff.

Daniel M. Snow, Pierce Atwood, Portland, ME, James Bopp, Jr., Eric C. Bohnet, Bopp, Coleson & Bostrom, Terre Haute, IN, for Consolidated Plaintiffs.

Paul Stern, Phyllis Gardiner, Andrew S. Hagler, Assistant Attorney General, Augusta, ME, for Defendants.

John R. Brautigam, Arn H. Pearson, Maine Citizen Leadership Fund, Portland, ME, Glenn J. Moramarco, Brennan Center for Justice, New York City, for Intervenor-Defendants.

## MEMORANDUM DECISION

HORNBY, Chief Judge.

The plaintiffs—candidates for the Maine House and Senate, campaign contributors, political action committees ("PACs") and the Maine Libertarian Party—challenge the constitutionality of the Maine Clean Election Act, 21–A M.R.S.A. § 1121 *et. seq.* (West Supp.1998). Maine citizens voted this measure into law as a voter initiative in the fall of 1996 after the Maine legislature declined to enact it. It makes public funding available to candidates running for state elective offices (House, Senate, Gov-

ernor) beginning in the year 2000 if they choose to participate in the program and accept its limitations. Although I do not rule at this time on the constitutionality of its contribution cap reductions for donations to nonparticipating candidates, I find the rest of the statute constitutional.

These are the particulars: Candidates who want state funding first collect "seed money contributions" from the public at no more than $100 per contributor.[1] *See* § 1122(9). Candidates can use this seed money to seek out the necessary number of "qualifying contributions," separate $5 contributions to the Maine Clean Election Fund in checks or money orders from registered voters. *See* § 1122(7). Candidates seeking a seat in the Senate and House of Representatives must collect 150 and 50 of these "qualifying contributions," respectively. *See* § 1125(3). Candidates must, before or during the qualifying period, "file a declaration of intent to seek certification as a Maine Clean Election Act candidate and to comply with the [Act's] requirements." § 1125(1).

Once certified by the Commission on Governmental Ethics on Election Practices (the "Commission") as a Maine Clean Election Act candidate, *see* § 1125(5), the candidate must transfer all unspent seed money to the state fund, must limit campaign spending to the amount the candidate receives from the state, and must not accept any more private contributions. *See* § 1125(5)-(6). There are civil and criminal penalties for violating these rules. *See* § 1127. The state, in turn, provides public funds for the certified candidate's campaign in a sum equal to the average amount spent in the previous two election cycles in a similar kind of election (*i.e.,* by office and type of election, general or primary, contested or uncontested).[2] *See*

1. Under 21–A M.R.S.A. § 1125(2), gubernatorial candidates are limited to $50,000 in seed money; Senate candidates to $1,500; and House of Representatives candidates to $500.

2. This amount is reduced by 25% for the first cycle (the reason is unclear; at oral argument

one of the lawyers suggested that it approximates the amount a certified candidate does not have to spend on fund-raising). For the 2000 elections, the amounts for House elections are $1,141 for the primary ($511 if uncontested) and $3,252 for the general elec-

§ 1125(7)-(8). If a privately funded opponent receives or spends more than the certified candidate receives from the Commission, the Commission issues the certified candidate a dollar-for-dollar match of the overage up to total state funding of no more than twice the original distribution. *See* § 1125(9). To implement this matching provision, the statute requires privately funded candidates to notify the state when they receive or spend over 1% more than what the certified candidate originally received from the state. *See* § 1017(3–B). Independent expenditures made by others on behalf of nonparticipating candidates also count as part of the calculation. *See* § 1125(9).

The plaintiffs charge overall that the Maine Clean Election Act is unconstitutional because it unfairly coerces candidates to participate in the public funding program. In particular, the plaintiffs claim that it penalizes candidates who choose not to opt into the public funding program by certifying their publicly funded opponents as "clean." Moreover, the plaintiffs claim that the matching funds mechanism of the statute has the effect of punishing non-certified candidates for spending money on their campaigns, that it is improperly keyed to receipts rather than spending, and that it requires excessive reporting by privately funded candidates. They also complain that independent expenditures spent in support of privately funded candidates or in opposition to certified candidates can trigger increases in the amounts of public funds available to certified candidates, even though the privately funded candidates have nothing to do with the expenditure

of independent funds on their behalf. They argue that this last provision—together with a longstanding provision requiring reports of any independent expenditure over $50—"burdens" those who make independent expenditures. In addition, they challenge the public funding of primary elections on the ground that the extra money for an opponent is doubly unfair to independent candidates who do not run in a primary. Finally, they claim that the public funding formula is wholly inadequate for any competitive campaign and that it will "starve" the candidates in such campaigns.[3]

## I. ANALYSIS

### A. PUBLIC FUNDING IN GENERAL

■ First, I start with the assumption that public financing of electoral campaigns is constitutional. *Buckley v. Valeo* established that proposition: "Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations." 424 U.S. 1, 57 n. 65, 96 S.Ct. 612, 46 L.Ed.2d 659. *Accord Republican Nat'l Comm. v. FEC*, 487 F.Supp. 280, 284 (S.D.N.Y.) (three-judge panel), *aff'd*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980) (Mem.). Far from being a threat to First Amendment values, such measures are an "effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge discussion and participation in the electoral process, goals vital to a self-governing people." *Buckley*, 424 U.S. at 92–93, 96

tion; for the Senate, $4,334 for the primary ($2,100 if uncontested) and $12,910 for the general election. (*See* Hain Dep., June 29, 1999, Ex. 2) For the next governor's election (2002) the amounts are $104,713 for the primary and $286,910 for the general election. (*See* Maine Clean Election Fund Distribution for Governors (Draft), Stipulated R. III.S.) Because the upcoming election does not involve the governor's office and because none of the plaintiffs purports to be a candidate for governor, I will not discuss further the por-

tions of the statute that apply to gubernatorial elections.

**3.** I do not address this final issue because I conclude that under constitutional requirements any public funding program must be voluntary; if it is voluntary, then criticisms that it is too penurious are ill-founded, since a candidate can simply choose not to participate.

S.Ct. 612. Such legislation "furthers, not abridges, pertinent First Amendment values." *Id.* at 93, 96 S.Ct. 612. It is therefore undeniable that public funding of election speech is consistent with the First Amendment.

■ Second, the Court of Appeals for this Circuit has recognized explicitly that a State may, without violating the Constitution, provide incentives to persuade candidates to use public funding and reduce their dependence on private contributions. *See Vote Choice, Inc. v. DiStefano,* 4 F.3d 26, 38 (1st Cir.1993) ("[t]he Supreme Court has upheld a very direct and tangible incentive: the provision of public funds to candidates who agree to place decreased reliance on private campaign contributions."). The Constitution does not require a State to be neutral on this subject, *id.* at 39; state legislation may actively favor public financing.

■ What state legislation may not do is eliminate altogether a candidate's voluntary choice in deciding whether to fund his/her election with private contributions or with public funding. Voluntariness is "an important factor in judicial ratification of government-sponsored campaign financing schemes." *Id.* at 38. "Coerced compliance" can be fatal; incentives might go too far. *Id.* According to the First Circuit, there "is a point at which regulatory incentives stray beyond the pale, creating disparities so profound that they become impermissibly coercive." *Id.* at 38.[4]

■ The Maine Clean Election Act passes the voluntariness test. It is a public financing mechanism that provides incentives to candidates to make the public financing route attractive, but the incentives hardly are overwhelming or of an order that can be said to create profound disparities. The initial funding is modest, and the publicly funded candidate cannot

raise or spend private money. If a privately funded candidate spends or receives more money than his/her publicly funded opponent received in the initial distribution, the Commission disburses to the publicly funded candidate a dollar-for-dollar match, but with a ceiling (twice the distribution) on how much the publicly funded candidate can receive in total public funds. Similar provisions have been upheld elsewhere. *See Gable v. Patton,* 142 F.3d 940 (6th Cir.1998) (approving Kentucky's 2–for–1 matching provision); *Rosenstiel v. Rodriguez,* 101 F.3d 1544 (8th Cir.1996) (approving Minnesota's 50% distribution rule), *cert. denied,* 520 U.S. 1229, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997). There are burdens as well—the seed money contribution is limited to $100 per contributor and the candidate must raise a significant number of $5 qualifying contributions. The Constitution does not require that the choice of funding mechanism for a candidate be "in exact balance—we suspect that very few campaign financing schemes ever achieve perfect equipoise," *Vote Choice,* 4 F.3d at 39. In fact, Maine's program presents a real choice, not a preordained decision, for a candidate.

I turn now to individual components of the legislation that the plaintiffs attack.

**B. CERTIFICATION**

■ The seemingly most petty dispute about the statute is ironically perhaps the most troubling. The statute requires the Commission to certify those who qualify as "a Maine Clean Election Act candidate." 21–A M.R.S.A. § 1125(5). The plaintiffs fear that the consequence will be a labeling of publicly funded candidates as "clean" candidates and privately funded candidates as "unclean" candidates. The terminology has obvious Old Testament overtones. The Commission apparently has had some

---

4. I will not debate whether the law amounts to a benefit for the publicly funded candidate or a penalty for the privately financed candidate. Because elections are a contest between at least two candidates, clearly the law confers both a benefit and a penalty—it depends on whose perspective is chosen. The First Circuit has pointed out a number of reasons why these labels do not assist the analysis. *See Vote Choice,* 4 F.3d at 38.

discomfort of its own and has sought to defuse the issue. In his affidavit, William Hain, the Commission's Executive Director, explained that candidates who have met the prerequisites "will be 'certified' by the Commission as eligible to receive public funding. The Commission will refer to such candidates thereafter as 'certified' candidates." Hain Dep., Vol. I, June 1, 1999, ¶ 6.

A state must tread carefully in labeling candidates. To be sure, there is a traditional role in identifying candidates with traditional labels such as party affiliation. *See League of Women Voters v. Gwadosky*, 966 F.Supp. 52, 62 (D.Me.1997). But all the Maine Clean Election Act really needed to do here to satisfy its legitimate objectives was to provide that the Commission would determine whether a candidate qualified for public funding. Certification and labeling are superfluous. Given the Commission's announcement of how it plans to proceed, however, I do not find this provision of the statute unconstitutional. What candidates choose to call themselves or their opponents is beyond state control; they can use pejorative and complimentary labels irrespective of the statute.

## C. MATCHING FUNDS

### (1) "Punishment" of First Amendment Activities

■ The plaintiffs complain most vociferously about the matching funds provision of the statute. That provision increases the public funding of a candidate to match his/her privately funded opponent up to a cap of twice the initial distribution once the privately funded opponent raises or spends an amount equal to 101% of the initial state distribution. The plaintiffs claim that this is a direct infringement of their First Amendment rights of speech and advocacy in an election. Their argument is that the threat of additional public funding for an opponent is a direct deterrent to raising or spending money for the privately funded candidate. Why should I advertise my candidacy, they say, if my opponent will be afforded the same opportunity?

It is here perhaps that there is the most profound disconnect between First Amendment jurisprudence, based upon the late-eighteenth century values reflected in the First Amendment, and what are assumed to be the political realities of late-twentieth century campaigning. To be specific, the plaintiffs want to preserve the ability to "out spend" their publicly-financed opponents. Their view of free speech is that there is no point in speaking if your opponent gets to be heard as well. The question is not whose message is more persuasive, but whose message will be heard. The general premise of the First Amendment as interpreted by the Supreme Court, on the other hand, is that it preserves and fosters a marketplace of ideas. *See, e.g., Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 295, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981). The image is one of candidates voicing their positions and competing on the inherent worth of their character and positions, and voters choosing accordingly. In that view of the world, more speech is better. If a privately funded candidate puts out his/her candidacy and ideas to the public, the public can only gain when the opposing candidate speaks in return. This "marketplace of ideas" metaphor does not recognize a disincentive to speak in the first place merely because some other person may speak as well.

In more conventional First Amendment language, the plaintiffs' argument is that a matching fund program limits First Amendment rights as follows: When a privately funded candidate speaks out in the First Amendment marketplace, the State unconstitutionally enters the marketplace and offsets the privately funded candidate's voice by providing money for the publicly funded opponent to raise his/her voice in response. That, the plaintiffs say, is not content-neutral, but results in the

State unconstitutionally taking sides in the First Amendment marketplace.[5]

The plaintiffs' argument proves too much. The Supreme Court has already upheld public funding subsidies of election candidates as furthering First Amendment values. Such programs are an "effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge discussion and participation in the electoral process, goals vital to a self-governing people." *Buckley*, 424 U.S. at 92–93, 96 S.Ct. 612. They "further[ ], not abridge[ ], pertinent First Amendment values." *Id.* at 93, 96 S.Ct. 612. As the Court noted, "[o]ur statute books are replete with laws providing financial assistance to the exercise of free speech, such as aid to public broadcasting and other forms of educational media, and preferential postal rates and antitrust exemptions for newspapers." 424 U.S. at 93 n. 127, 96 S.Ct. 612 (citations omitted). The test for constitutionality of candidate public funding mechanisms in this Circuit and elsewhere is whether the decision for a candidate to participate in a public funding scheme remains essentially voluntary. *See Vote Choice*, 4 F.3d at 38; *Rosenstiel*, 101 F.3d at 1549–53; *Gable*, 142 F.3d at 948. There is nothing unfair, and no profound disparity, in Maine's decision to make the public funding equivalent to that which a privately funded candidate may raise, *see Gable*, 142 F.3d at 949 (supporting a 2–for–1 match), particularly when the public funding has a modest cap. Consequently, I reject the plaintiffs' contention that the matching fund provision infringes on the plaintiffs' First Amendment rights.

### (2) Receipts vs. Spending

■ The plaintiffs argue that it is unfair to tie the public funding match to amounts the privately funded candidates raise, rather than limit it to amounts they spend.

They point out that not every dollar a candidate raises is necessarily spent in the election; instead, some of these amounts may be used by legislative leadership for distribution to other candidates, or spent after the election on supplementing the modest constituent allowance, funding future campaigns, or retiring debt. Were the State *not* to tie the match to receipts as well as expenditures, however, a privately funded candidate would be able to amass a war chest, then spend it all in the last day or two before the election without an opportunity for the publicly funded candidate to obtain his/her matching funds and spend them effectively. To avoid this type of gamesmanship, measuring the match by receipts as well as expenditures is a legitimate approach for the legislation to take. The privately funded candidate who does not need extra receipts can simply defer them and thereby avoid having his/her publicly funded opponent obtain more money.

### (3) Excessive Reporting

■ All candidates for State Senator and State Representative, whether privately or publicly financed, must file a regular report six days before election day itemizing contributions made to, and all expenditures made or authorized by, the candidate, *see* sec. 1017(3–A)(A)–(B); and, during the last 12 days before the election (until 48 hours before the end of the election), reports of individual contributions and expenditures over $1,000 within 48 hours of the respective contribution or expenditure. *See* 21–A M.R.S.A. 1017(3–A)(C) (West 1993). Under subsection 1017(5), all reports required under section 1017 "must contain the itemized accounts of contributions received … including the date a contribution was received, and the name, address, occupation,

---

**5.** The plaintiffs' argument would essentially limit public funding programs to a fixed amount of public subsidy and permitted expenditures set in advance. In such a program, a candidate makes a one-time choice whether to participate. The plaintiffs object to any program that is flexible because they view it as the State unconstitutionally responding to First Amendment activities of nonparticipants.

principal place of business, if any, and the amount of the contribution of each person who has made a contribution aggregating in excess of $50." Additionally, all reports "must contain the itemized expenditures made or authorized during the report filing period, the date and purpose of each expenditure and the name of each payee and creditor." *See* § 1017(5). The plaintiffs do not challenge these requirements.

What the plaintiffs do challenge is subsection 1017(3–B), the accelerated reporting provision that voters enacted along with the Maine Clean Election Act, and the regulations the Commission has adopted for additional reporting. Subsection 3–B empowers the Commission to establish by rule an expedited reporting schedule applicable to candidates who receive, spend, or obligate more than one percent of the funds initially distributed to their certified opponent. *See id.* The Commission requires these candidates to submit three or more additional reports. *See* Commission on Governmental Ethics and Election Practices, *Rule to Implement the Maine Clean Election Act and Related Provisions,* 94–270 (1998), ch. 1, § 7. The first such report, the "101 percent" report, is one required by the express language of subsection 1017(3–B); when a non-certified candidate reaches the 101 percent mark, he or she must report to the Commission. *See id.* § 7(2). The second and third reports update the 101 percent report; candidates must file these 21 days and 12 days prior to the election. *See id.* § 7(3)-(4). Finally, non-certified candidates must submit their own "48–hour" report in addition to the "48–hour" report required of all candidates. *See id.* § 7(5). This report informs the Commission of "single expenditures of . . . $750 by candidates for State Senator, and $500 by candidates for State

Representative made after the 12th day before any election and more than 48 hours before 5 p.m. on the date of that election." *Id.* The report is due within 48 hours of the expenditure. *See id.* Thus, a publicly funded candidate for, say, State Senate must file a regular report and, depending on expenditures, one or more regular 48–hour reports. The non-certified opponent must file a regular report and, depending on contributions and expenditures, a regular 48–hour report, and if he/she exceeds the State funding distribution, a 101 percent report, two updated 101 percent reports, and again, depending on contributions and expenditures, one or more non-certified candidate's 48–hour reports. The plaintiffs complain that these reporting requirements are coercive and that no candidate could rationally choose to forego public funding and undertake this burdensome reporting scheme.

If the matching provision is to work, clearly some reporting mechanism is required. The issue is whether the statute, as interpreted by the Commission, goes too far—so as to remove the voluntariness of the public funding choice because privately funded campaigns have been made too onerous; or because the measures intrude on First Amendment rights and are not narrowly tailored to compelling governmental interests.

The State's only legitimate interest in requiring the additional reports from privately funded candidates is to keep track of their funding so that the matching mechanism will work. All the Commission needs to know in the additional reports, therefore, are the total contributions and expenditures. The statute seems to recognize this in ordering a report as to the "candidate's total campaign contributions, obligations and expenditures to date."[6]

---

**6.** There is an ambiguity here. The statute requires filing of a report "detailing the candidate's total campaign contributions, obligations and expenditures to date." The word "detailing," if given precedence, could require the details resulting in the total as opposed to a simple specification of the totals.

Moreover, subsection 3–B is an addition to an already existing section 1017 that has a definition of "report" that requires a very detailed itemization. At this point, the Commission has not yet specified either by rule or by form design what the accelerated reports will in fact contain.

21–A M.R.S.A. § 1017(3–B). Indeed, seeking more detail than that would give the publicly funded candidate an unfair tactical advantage of being able to perceive exactly how his/her opponent is spending campaign monies. So far as enforcing other provisions of the campaign financing law is concerned, the State has no greater interest in expedited reports from privately funded candidates than it does for publicly funded candidates; any necessary detailed reporting can occur after the election. Furthermore, if a privately funded candidate exceeds double the state funding formula, the match ceases to operate and the State no longer has an interest in the expedited disclosures.

It is my obligation to interpret the statute, if it reasonably can be read that way, to be constitutional. To require reports of the frequency provided here is a narrowly tailored measure to make a compelling governmental interest—the matching provision—work, only if totals alone need to be reported and if the obligation to provide expedited reports ends once the privately funded candidate exceeds double the state funding. Required reporting of only totals, moreover, is not so onerous as to make public funding an involuntary choice. The challenge to this provision is to the statute and regulations on their face, since I do not yet have their application on this subject before me. Accordingly, as I construe them, they satisfy First Amendment concerns.[7]

### D. INDEPENDENT EXPENDITURES

■ Individual citizens sometimes decide to spend money supporting or opposing a candidate without the authorization or involvement of the candidate or his/her campaign organization. These have come to be called "independent expenditures." In *Buckley*, the Supreme Court struck down a $1,000 federal limit on such expenditures, emphasizing that they are entitled to a high level of First Amendment protection. 424 U.S. at 4, 51, 96 S.Ct. 612. The First Circuit has struck down a similar limit on independent expenditures imposed by New Hampshire legislation. *New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 19–20 (1st Cir.1996). But Maine has not imposed a limit on independent expenditures, only counted them as part of the monies attributable to a privately funded candidate when deciding whether to match the funding. *See* 21–A M.R.S.A. § 1125(9). Maine has also required ever since 1975 that any independent expenditures over $50 be reported. *See* 1975 Pub.L. No. 759, sec. 1, as amended and codified at 21–A M.R.S.A. § 1019 (West Supp.1998). The plaintiffs attack these provisions as violating the First Amendment rights of both privately funded candidates and citizens or groups who want to make independent expenditures. The candidates contend that they cannot control these expenditures, may not want them, and may not actually benefit from them. The plaintiffs who want to make independent expenditures complain that the threat of a match from public funds creates a disincentive for them to exercise their First Amendment rights in the first place.[8]

The reason the legislation counts the independent expenditure against the candidate on whose behalf it is used is obvious: such independent expenditures can in fact be of great assistance to a candidate and

---

**7.** If significantly more detail were required in the reports or if the obligation to report continued beyond the cap I have mentioned, I would have serious doubts about constitutionality.

**8.** I reject the argument that the match calculation unconstitutionally burdens the First Amendment rights of those who intend to make independent expenditures on the same basis as I have upheld the matching provision

in general. Arguably, this conclusion is contrary to that of *Day v. Holahan*, 34 F.3d 1356 (8th Cir.1994), *cert. denied*, 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995). In *Day*, however, the court rejected the legitimacy of the public funding justification because even without the new measure concerning independent expenditures, candidate participation in Minnesota's public funding already approached 100%.

could furnish an easy loophole to avoid the parity of the matching fund scheme if they were not counted. The Commission has adopted the reasonable regulation that in calculating the match, independent expenditures in support of the publicly funded candidate will also be taken into account. *See* Commission on Governmental Ethics and Election Practices, *Rule to Implement the Maine Clean Election Act and Related Provisions,* 94–270 (1998), ch. 1, § 6(3)(B)(2)(b).[9] The overall solution is not perfect, but there is no perfect solution.[10]

■ So far as reporting of independent expenditures is concerned, the provision in question has existed since 1975, and the 1996 voter referendum made only modest changes. *Compare* 21–A M.R.S.A. § 1019 (West 1993) *with* 21–A M.R.S.A. § 1019 (West Supp.1998). Specifically, this provision requires a report to be filed for every independent expenditure exceeding $50, and if an expenditure is more than $500, an itemized report must be filed. *See* § 1019(2) (West Supp.1998).

In *Buckley,* the Supreme Court upheld the constitutionality of a provision, section 434(e) of the Federal Election Campaign Act ("FECA"), that required those making independent expenditures exceeding $100 to file a report with the federal government. *See* 424 U.S. at 80–81, 96 S.Ct. 612.

The Court, concerned about "the right of associational privacy," applied a strict scrutiny test, *id.* at 75, 96 S.Ct. 612, but concluded that " § 434(e), as construed, bears a sufficient relationship to a substantial governmental interest." *Id.* at 80, 96 S.Ct. 612.

In upholding the constitutionality of the provision, the Court described the government's interest in this type of reporting requirement as designed "to insure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible." *Id.* at 76, 96 S.Ct. 612. Emphasizing the "informational interest," the Court observed that the provision "goes beyond the general disclosure requirements to shed the light of publicity on spending that is unambiguously campaign related but would not otherwise be reported because it takes the form of independent expenditures or of contributions to an individual or group not itself required to report the names of its contributors." *Id.* at 81, 96 S.Ct. 612.

Based on the *Buckley* analysis, I conclude that Maine's reporting requirement is constitutional. The Maine statute, like the FECA, requires those who make independent expenditures related to the express advocacy of a particular candidate to report their expenditures. *Compare* 21–A

9. At first glance it seems unfair that a publicly funded candidate can apparently receive the benefit of independent expenditures with no reduction in his/her public funding until the privately funded candidate exceeds the threshold and causes an increase in the publicly funded candidate's entitlement. But if every independent expenditure on behalf of a publicly funded candidate were recognized from the beginning, outsiders could essentially deprive the publicly funded candidate of all funds and the ability to run his/her own campaign. In contrast, the privately funded candidate has the right and ability to continue to raise money whereas the publicly funded candidate does not.

10. Another potential difficulty is the three-candidate race, where one candidate is publicly funded and two candidates are privately funded. If one private candidate raises a lot

of money, the program will distribute matching funds to the publicly funded candidate, but the other private (third) candidate will be left in the lurch. There is no indication that this is a likely occurrence. *Cf. Buckley,* 424 U.S. at 68–72, 96 S.Ct. 612 (rejecting claims that independent disclosure requirements posed a danger to minor parties because they claimants failed to provide evidence of any danger). In fact, new candidates with little money are likely to elect the public funding alternative. If it turns out to be a severe First Amendment issue in actuality, it can be dealt with then. *Cf. Brown v. Socialist Workers '74 Campaign Committee,* 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (finding disclosure provisions of Ohio law unconstitutional as applied to Socialist Workers Party, a minor political party whose members would be subject to harassment).

M.R.S.A. § 1019 (West Supp.1998) *with* 424 U.S. at 76–80, 96 S.Ct. 612 (construing § 434(e)). The only difference between the two provisions is the expenditure threshold that triggers the reporting requirement. The FECA threshold approved in *Buckley* in 1976 was $100 [11] and Maine's threshold adopted in 1975 is $50. I do not believe these differing thresholds affect the ultimate analysis. Additionally, the FECA required extensive reporting once that $100 threshold was surpassed, *see* 424 U.S. at 157–59, 96 S.Ct. 612 (appendix presenting § 434(e), the reporting requirements), while the Maine statute only requires a detailed report after $500 have been spent in independent expenditures. *See* 21–A M.R.S.A. § 1019(2).

### E. PUBLIC FUNDING FOR PRIMARY ELECTIONS

 The plaintiffs object that independent candidates who have no primary to run in, but simply run in the general election, are particularly disadvantaged because their publicly funded opponents obtain extra money deriving from the separate allocation for primaries and general elections. The premise of the argument seems to be that name recognition achieved in a publicly funded primary carries over to a general election and that an independent candidate is therefore doubly prejudiced. On the other hand, candidates who do run in a primary election must spend money and it would be unfair in a public funding measure to ignore that necessity. The amounts distributed here are hardly huge,[12] and I conclude that the separate allocation for primaries is necessary to make the public financing measure effective.

11. The dollar threshold was subsequently increased from $100 to $250. *See* 2 U.S.C.A. § 434(c) (West 1997).

12. $1,141 for contested House primaries, $4,334 for contested Senate primaries, $511 for uncontested House primaries, and $2,100 for uncontested Senate primaries. (*See* Hain Dep. June 29, 1999, Ex. 2.)

13. Indeed, it may be sufficient if the legislation is "in furtherance of sufficiently impor-

### II. CONCLUSION

I conclude, therefore, that Maine's public financing mechanism overall is voluntary and does not create undue disparities. That should be the end of the First Amendment analysis. *Buckley*, 424 U.S. at 92–93, 96 S.Ct. 612; *Vote Choice*, 4 F.3d at 39 (voluntary public funding supports, not abridges, First Amendment values). If it is necessary to go further, I find that the financing mechanism is narrowly tailored to compelling governmental interests.[13] The First Circuit has recognized such interests in a public funding measure, like Maine's, that will "facilitate communication with the electorate, free candidates from the pressures of fundraising, and, relatedly, tend to combat corruption." *Vote Choice*, 4 F.3d at 39 (quotations and citations omitted). The State accordingly may make public funding an attractive choice and still pass constitutional muster. *Id.*

The fact that this legislation came into being by way of petition/referendum rather than by the legislature's enacting it does not change the standard of review. No greater deference is due the popular will expressed in an initiative when it is being tested against the First Amendment. After all, the majority can intrude upon constitutional rights through direct democracy as easily as it can through its elected representatives. *See Berkeley*, 454 U.S. at 295, 102 S.Ct. 434. But no less deference is due a popular initiative, either. States are entitled to choose the methods by which law is made,[14] and there is no reason to give one form greater weight than another in assessing its constitutionality under the federal constitution. I do not ac-

tant governmental interests and has not unfairly or unnecessarily burdened the political opportunity of any party or candidate." *Buckley*, 424 U.S. at 95–96, 96 S.Ct. 612.

14. In Maine, voter initiatives are one way of making law. *See* Me. Const. Art. IV, Part First § 1; *id.*, Part Third § 18(1).

cept the proposition that legislatures are entitled to more deference because they have committees that hold hearings and are able to give more deliberation to their legislative product. It is not for the judiciary to pry into the minds of legislators to determine whether they have voted their own self-interest or the interest of their constituents, or both, in enacting a particular piece of legislation; the same holds true for prying into the minds of individual voters when they vote on a petition/referendum.

I will continue to consider the constitutional challenge to Maine's reduced contribution limits for privately funded campaigns. *See* 21–A M.R.S.A. § 1015 (West Supp.1998). That question is more difficult and the difficulty is compounded by the fact that the Supreme Court has heard argument on a similar case, *Nixon v. Shrink Missouri Gov't PAC,* 68 U.S. Law Week 3288, 1999 WL 813789 (oral argument on No. 98–963 on October 5, 1999), and presumably will announce, sometime before its term ends in June, 2000, what the new rules are for analyzing the question. In any event, there is no reason to delay the certain appeal of my decision upholding the constitutionality of the Maine Clean Election Act.[15] All of the parties want certainty on that issue, which can only be provided by the Court of Appeals.

Accordingly, under Fed.R.Civ.P. 54(b), I ORDER the Clerk to enter final judgment in favor of the defendants on Counts Three, Four, Five, Six, Seven, Eight, Nine and Ten of the Daggett, et al. Complaint, and on the third claim for relief in the Stearns, et al. Complaint.

SO ORDERED.

---

**15.** I recognize that the plaintiffs contend that one of the reasons that public funding in Maine is "involuntary" is that the private contribution ceilings are so low that a privately funded candidate cannot realistically raise enough money. My decision on voluntariness, therefore, should be read as assuming—without deciding—that the lower limits will stay in effect. If ultimately I find these reduced limits unconstitutional and restore the pre-existing higher limits, then the "involuntary" argument is even weaker.